PRESENT: Keenan, Koontz, Kinser, Lemons, Goodwyn, and
Millette, JJ., and Lacy, S.J.

JONATHAN P. GRATTAN, II

OPINION BY
v.      Record No. 082547     JUSTICE CYNTHIA D. KINSER
November 5, 2009
COMMONWEALTH OF VIRGINIA

FROM THE COURT OF APPEALS OF VIRGINIA

This appeal involves two questions: whether the trial
court's finding that the defendant was competent to stand
trial was plainly wrong or without evidence to support it and
whether its decision barring the defendant's introduction of
expert testimony on the issue of his sanity at the time of the
offenses was an abuse of discretion. We answer both questions
in the negative and will therefore affirm the judgment of the
Court of Appeals of Virginia upholding the defendant's
convictions.

I. RELEVANT FACTS AND PROCEEDINGS

On the morning of April 30, 2006, Jonathan P. Grattan,
II, using an AK-47-style, semi-automatic rifle loaded with
steel core ammunition, fired approximately forty rounds into a
vehicle occupied by his neighbors, Dr. William Gardner and his
wife, Carol Gardner, as the vehicle passed by his house.
Carol Gardner died at the scene from her wounds. Dr. Gardner
suffered life-threatening injuries but survived the attack.

When the police arrived at Grattan's residence, he refused to come out of the house and engaged in a 20-hour standoff with the police, repeatedly exchanging gunfire. He ultimately surrendered when the police deployed an armed robot into the house. During part of the standoff, Grattan's grandmother was in the residence, and the police repeatedly fired canisters of tear gas into the house in an attempt to get Grattan and his grandmother to come outside. When the police were finally able to enter the house and remove Grattan's grandmother, she told them of her suspicion that Grattan had been using illegal drugs.

Several times during the standoff, Grattan spoke on a telephone with a police negotiator. In those conversations, Grattan accused the Gardners of taking "gamma pictures" of him and trying to murder him. He told the police negotiator that the situation could by resolved by "blow[ing] up" the Gardners' home and "tak[ing] the . . . refrigerator out of the ground." After his surrender and arrest, Grattan stated that he attacked the Gardners "for justice" because they harassed him and shot him with "gamma rays." He also admitted the Gardners were unarmed when he shot them and there had been no confrontation with them that morning before he started shooting into their vehicle.

Approximately five months prior to the shooting, Grattan called "911," stating that he had been shot "500 times with [a] f---ing gamma" and that "they" had a microwave pointed at him. Grattan told the 911 operator that his neighbors had been firing at him for four days and that he was dying from radiation poisoning. As a result of that incident, Grattan was hospitalized for mental health treatment with a diagnosis of "[a]cute paranoid psychosis probably secondary to methamphetamine abuse rule out underlying psychosis" as well as methamphetamine abuse. After four days of treatment, Grattan was discharged and referred to further psychiatric treatment as an outpatient.

Due to the attack on the Gardners, a grand jury returned 16 indictments against Grattan, charging him with the first degree murder of Carol Gardner, in violation of Code § 18.2-32; aggravated malicious wounding of Dr. Gardner, in violation of Code § 18.2-51.2; six counts of attempted capital murder of a law enforcement officer, in violation of Code §§ 18.2-25 and -31(6); and eight counts of using a firearm in the commission of a felony, in violation of Code § 18.2-53.1. Prior to his trial, Grattan filed a notice pursuant to Code § 19.2-168, stating his intention to put in issue his sanity at the time of the charged offenses and to present expert testimony in support of that defense. At a hearing on January 18, 2007,

3

Grattan's counsel also expressed concern about Grattan's competency to stand trial. At the request of the Commonwealth and in accordance with Code §§ 19.2-168.1(A) and -169.1(A), the circuit court appointed two mental health experts to evaluate both Grattan's sanity at the time of the offenses and his competency to stand trial. At the same hearing, the court advised Grattan to cooperate with the Commonwealth's mental health experts and that under Code § 19.2-168.1(B), his failure to do so could lead to the exclusion of his own expert evidence supporting his claim of insanity. When asked by the court, Grattan indicated that he understood the court's instructions.

At a hearing on January 30, the Commonwealth asked the circuit court to instruct Grattan once more that he must cooperate with the Commonwealth's mental health expert who was appointed to evaluate Grattan's competency to stand trial. The Commonwealth stated that Grattan had twice refused to meet with its expert, Dr. Leigh D. Hagan. Consequently, the court admonished Grattan:

> I will caution you again that you are required by law to cooperate with the mental health evaluator appointed by the [c]ourt to evaluate your competency to stand trial. . . . [I]f the [c]ourt believes as it now stands that you are malingering and putting on a charade . . . the [c]ourt on the evidence now before it would be strongly inclined to find you competent to stand trial. You give every appearance of being competent. You have appeared competent on

4

all your prior appearances here.  And therefore this could have dire and severe consequences because when we commence the trial the [c]ourt will preclude any mental health expert opinion on your sanity at the time of the offense.

At a subsequent hearing to determine Grattan's competency to stand trial, Grattan introduced testimony and a written report from Dr. Thomas V. Ryan, a licensed clinical psychologist, and a written competency evaluation by Dr. Bruce J. Cohen, a psychiatrist.[1]  Although Dr. Ryan met with Grattan once for five hours, Grattan refused to see him on three other occasions.  Dr. Cohen interviewed Grattan three times and reviewed, among other information, Dr. Ryan's psychological assessment.

Dr. Ryan, after being qualified as an expert in neuropsychology, opined that Grattan was "clearly not competent" to stand trial.  Dr. Ryan tested Grattan's competency in three categories: understanding of the legal system, reasoning and the ability to assist counsel, and appreciation of the specific legal situation and circumstances at hand.  According to Dr. Ryan, Grattan scored "within the clinically significant impairment range" in all three categories.

---

[1] Dr. Jeff Raynor also participated in this evaluation but only Dr. Cohen signed the written report.  Therefore, we will refer to this evaluation as being that of Dr. Cohen.

Dr. Ryan also opined that Grattan suffered from schizophrenia but acknowledged that a mentally ill individual can nevertheless be competent to stand trial. He further testified that just because an individual can function in a structured environment such as a prison does not mean the person is not psychotic or mentally ill. In his written report, Dr. Ryan stated that Grattan was likely "responding to internal stimulation and psychotic thought processes as evidenced by his inappropriate laughter, rapid changes in his demeanor, very poor eye contact, and severe restlessness." He also reported that Grattan "demonstrated throughout [the] entire assessment tangential thinking and delusional ideation regarding the criminal offense." Finally, Dr. Ryan opined that Grattan was not malingering, or attempting to exaggerate or fabricate his psychotic symptoms.

Dr. Cohen reported, among other things, that Grattan was not able to engage in any meaningful discussion about the offenses or his case, did not understand the reason for his trial, had continued delusional beliefs about the victims shooting rays into his house, provided inconsistent and often delusional recollections about the offenses, did not understand the concept of plea bargains, and did not comprehend the advantages and disadvantages of pleading insanity. He concluded that Grattan suffered from

6

schizophrenia and had "significant deficits . . . that specifically appeared to impair his ability to understand the proceedings against him, to appreciate his current life situation and to make decisions that would assist his attorneys in adequately defending him."  Based on Grattan's knowledge of his case and the offenses, Dr. Cohen stated that it was "highly unlikely that [Grattan] would be able to adequately assist his attorneys or participate in his defense."[2]

Dr. Lou Gene Bartram, who qualified as an expert in psychiatry, testified on behalf of the Commonwealth.  Dr. Bartram examined Grattan in the local jail eleven days after his arrest.  Grattan told Dr. Bartram that he did not need a psychiatrist and that "it was either him or them and he was not sorry that he had killed them."  Dr. Bartram stated that she saw no psychotic symptoms nor any methamphetamine induced psychosis or schizophrenia, but that post acute withdrawal was consistent with her observations of Grattan.  Dr. Bartram diagnosed Grattan as having a personality disorder with narcissistic traits, and methamphetamine and cannabis dependence.

---

[2] At the close of the Commonwealth's evidence at the competency hearing, Grattan's counsel proffered to the circuit court that their client was frequently non-responsive and would not return their telephone calls.

After being qualified as an expert in forensic and clinical psychology, Dr. Hagan testified on behalf of the Commonwealth about the court-ordered competency evaluation of Grattan he conducted on January 30 after the circuit court ordered Grattan to meet with him. Dr. Hagan conducted his evaluation in the courtroom because, in part,

> it would be far more illuminating to the issue of competence to know how [Grattan] would respond in this particular setting where a trial would take place. . . . [Y]ou're much more likely to get true accurate data if you assess that person under the conditions that they are supposed to actually demonstrate that capacity.

Based on his interview with Grattan and his review of other information, including the reports from Drs. Ryan and Cohen, Dr. Hagan rendered the following specific opinions: Grattan possessed the capacity to comprehend and appreciate the charges against him and the significant liberty interest at stake (Grattan recited the numerical sentencing ranges for the various charges); he possessed the capacity to communicate and provide relevant information to his attorneys and to participate in trial preparation, but it would be Grattan's election whether to do so; he understood the adversarial nature of the proceedings; he possessed sufficient knowledge of the legal strategies and options available to him; he knew how to behave appropriately in court; and he understood the roles of the primary participants in the proceedings. Dr.

Hagan also opined that Grattan was able to modify his behavior because he followed the instructions of a deputy to stop rocking his chair during the evaluation.  In sum, Dr. Hagan concluded that Grattan was competent to stand trial, stating that he "currently possesses an understanding of the charges against him, of the risk attendant to those, of the options available, and that he is able, he has the capacity to assist not only in trial preparation but to have a presence in court."[3]

Dr. Hagan acknowledged that, for purposes of the competency evaluation, he did not form an opinion about whether Grattan was suffering from a mental illness, or was psychotic, delusional, or hallucinating.  He stated, however, that he observed for such and did not "see it [or] hear it." He explained that a "diagnosis of schizophrenic is in and of itself not determinative of the issue [of competency to stand trial].  Some people who have a diagnosis of schizophrenic can be competent whereas others may not."  According to Dr. Hagan, competency to stand trial does not "hinge on a diagnosis" but is "a functional capacity."  He also stated that, after

_____

[3] Dr. Hagan's evaluation of Grattan was audio and video recorded, and approximately twenty-four minutes of the seventy-four minute videotape was played during Dr. Hagan's testimony.  Both the audio and video recordings of the evaluation were admitted as exhibits for the Commonwealth.

9

preparing his report, he returned to the jail to see Grattan again, but Grattan for the third time refused to cooperate.

The Commonwealth also presented testimony from Frederick T. Wolfrey, an inmate with Grattan at the local jail. Wolfrey stated that Grattan told him and another inmate that he was doing such things as not bathing for weeks and talking about frogs coming out of the toilet because it was his only chance at getting less than twenty years. Wolfrey also testified that Grattan would act strangely one minute and the next minute would not. When asked if he regretted what he did, Grattan told Wolfrey he would do it again.

Several deputies who interacted with Grattan while he was incarcerated in the local jail likewise testified on behalf of the Commonwealth. Their testimony established that when a deputy smelled smoke coming from Grattan's cell, Grattan disposed of cigarette butts in the toilet before the deputy could retrieve them. The deputies also testified about Grattan's checking out legal books from the library, watching television and playing cards with other inmates, and following the guards' orders. Several deputies explained that Grattan ordered canteen items, followed up regarding their delivery, and complained when he did not receive all the ordered items. They further related that when Grattan was moved to a different cell, he reminded them to move his canteen items and

10

library books to his new cell. One deputy also testified that Grattan, upon being disciplined for involvement in a fight, appealed his penalty and requested that a witness testify as to Grattan's claim of self-defense.

After hearing argument, the circuit court made the following ruling:

> Based upon the evidence that has been introduced at this hearing and the [c]ourt's observation of the defendant in the courtroom, and today we've been here for six, seven hours I guess, somewhere in that range, the [c]ourt finds that the defendant has not carried his burden of proof by a preponderance of the evidence to show that he is not fit to go to trial. The [c]ourt believes he is competent and has the capacity to understand the charges against him, to understand the possible penalties that he faces and the capacity to cooperate and work with his lawyers and his defense team if he cares to do so. Therefore, the [c]ourt will find based on the record and the evidence introduced today that Mr. Grattan is competent to stand trial.

At the conclusion of the competency hearing, the Commonwealth informed the circuit court that Grattan continued to refuse to meet with Dr. Hagan to be evaluated as to his sanity at the time of the offenses. In Grattan's presence, the court directed the Commonwealth to have both Dr. Hagan and Dr. Bruce Harry, the Commonwealth's other mental health evaluator, attempt again to meet with Grattan. The court further stated it would consider at trial "whether . . . under the statute [Grattan's non-cooperative actions were] tantamount to a functional refusal . . . and then the [c]ourt

11

will have to determine which sanctions, if any, it will impose."

On the first day of trial, the Commonwealth moved, pursuant to Code § 19.2-168.1, to bar Grattan from introducing expert testimony on the issue of his sanity at the time of the offenses. The Commonwealth pointed out that Grattan only met with Dr. Hagan once and only for the purpose of evaluating Grattan's competency to stand trial. According to the Commonwealth, Grattan refused on several occasions to meet with Dr. Hagan and also failed to cooperate with Dr. Harry for the purpose of their evaluating Grattan's sanity at the time of the offenses. As the Commonwealth noted, Grattan did so despite repeated warnings from the circuit court about the consequences of his refusal to cooperate with the Commonwealth's mental health evaluators.

The Commonwealth argued that Grattan's refusal, in light of his meeting with his own mental health experts, prejudiced its case and that the only appropriate remedy was the exclusion of all expert testimony on the subject of Grattan's sanity at the time of the offenses. Grattan's knowing and voluntary choices while in jail and his competency to stand trial, the Commonwealth asserted, proved that whatever mental illness he might have did not prevent him from making his own decisions. Grattan, however, argued that his mental illness

12

was the cause of his refusal to cooperate and that the circuit court should craft an alternative, less drastic, remedy. Grattan also noted that he had refused to meet with his own experts on several occasions and argued that the Commonwealth's experts could evaluate Grattan's sanity at the time of the offenses without a personal interview.[4]

The circuit court granted the Commonwealth's motion, stating that "[u]nder all of the circumstances of this case . . . the only fair and reasonable alternative is to exclude the expert testimony of the defendant on the issue of his insanity at the time of the offense[s]." Following this ruling, Grattan waived his right to a jury trial, and the circuit court heard the evidence of both parties in the form of proffers. Grattan stipulated that the evidence "would be received as credible evidence by the trier of fact." The circuit court found Grattan guilty on all sixteen charges.

Prior to sentencing, Grattan filed a motion requesting the circuit court to order evaluations pursuant to Code §§ 19.2-176 (determination of insanity after conviction but before sentencing) and -169.1 (competency). Grattan argued

---

[4] During the hearing on the Commonwealth's motion, Dr. Harry testified on cross-examination that, although not ideal, it would be feasible and proper for him to conduct an evaluation of Grattan without a personal interview by using the available medical records and the reports of Drs. Ryan and Cohen.

that there was "reasonable ground" to question Grattan's mental state and the court should thus order a sanity evaluation prior to sentencing. Code § 19.2-176. Grattan also argued that the court, pursuant to Code § 19.2-169.1, should order a competency evaluation prior to sentencing.

At the sentencing hearing, the circuit court heard evidence on Grattan's motion. Inmate Dennis D. Crider testified to Grattan's bizarre behavior in jail. He stated that Grattan would stand in the shower fully dressed and talk to himself, run around as if someone were chasing him, beat his mattress and call it names, talk to imaginary people, lick the wall and stare at it while on his hands and knees, and talk about how the telephone and the floor were dangerous.

Dr. Ryan also testified, repeating his findings on Grattan's competency to stand trial and stating that Grattan again refused to see him after the competency hearing. Dr. Ryan was, however, able to speak with several jail deputies. They related that Grattan had poor hygiene, exhibited bizarre behavior, and refused to meet with his family. Dr. Ryan stated that this information, in addition to Crider's testimony, further supported his opinion that Grattan was mentally ill, incompetent to stand trial, and in need of medication.

14

Dr. Cohen then testified and reiterated the opinions set forth in his original report.  Dr. Cohen also stated that the accounts of the jail deputies and Crider affirmed his previous conclusions regarding Grattan's mental illness.  Dr. Cohen criticized Dr. Hagan's competency evaluation, calling it "a partial evaluation" because it did not include a "detailed mental status examination" and "a review of [Grattan's] past psychiatric symptoms and history."  Like Dr. Ryan, Dr. Cohen indicated that Grattan's ability to function in jail did not affect his diagnosis of Grattan.  He explained that a mentally ill individual can be out of contact with reality in some areas of life but not in others.  Finally, Dr. Cohen stated that Grattan's schizophrenia could be treated with medication in a mental health facility.

The Commonwealth then presented evidence in opposition to Grattan's motion.  Several jail deputies testified, establishing that Grattan was once directed to shower because of his poor hygiene, he often slept and laid in bed, like many other inmates, and he had a small "leadership" position in the jail.  Chadrick Cave, who had been incarcerated with Grattan for two months, testified that Grattan exhibited bizarre behavior and, when asked why he acted that way, told Cave that he knew what he was doing and that he "need[ed] to get the insanity plea to get less time."  Grattan also told Cave that

15

he shot the Gardners because "the dentist shot his dog," it was fun, and he would do it again.

Grattan's counsel argued that the additional testimony of Drs. Ryan and Cohen, Grattan's persistent bizarre behavior, and his refusal to meet or speak with counsel established that Grattan was unable to assist his attorneys and was thus incompetent to be sentenced. For these reasons, Grattan requested additional competency and sanity evaluations. The Commonwealth asked the circuit court to proceed to sentencing because Grattan had not met his burden of proof regarding the need for the requested evaluations. The Commonwealth maintained that nothing regarding Grattan's mental state or competency had changed since the court's previous rulings and that the testimony proved Grattan was competent, sane, and capable of making his own decisions.

The circuit court overruled Grattan's motion, finding him competent to be sentenced. After hearing evidence at sentencing from both parties, the circuit court sentenced Grattan to life in prison plus seventy-four years.

In an unpublished opinion, the Court of Appeals of Virginia affirmed the circuit court's judgment and upheld Grattan's convictions. Grattan v. Commonwealth, Record No. 1614-07-3, slip op. at 1 (Nov. 25, 2008). The Court of Appeals held that the record contained credible expert and lay

testimony sufficient to support the circuit court's determination that Grattan was competent to stand trial. Id., slip op. at 7. The Court of Appeals also held that the circuit court did not abuse its discretion by barring the introduction of expert witness testimony regarding Grattan's sanity at the time of the offenses. Id., slip op. at 9.

Now on appeal to this Court, Grattan raises two issues. He asserts that the Court of Appeals erred in holding that the circuit court was not plainly wrong in finding Grattan competent to stand trial. He further claims that the Court of Appeals erred in holding that the circuit court did not abuse its discretion by barring Grattan's introduction of expert testimony on the question of his sanity at the time of the offenses. We will address the issues seriatim.

## II. ANALYSIS

### A. Competency

Grattan argues that the circuit court was plainly wrong in finding him competent to stand trial. He contends that the competency evaluations of Drs. Ryan and Cohen, along with the facts of the crime, his bizarre behavior, his inability to communicate with his attorneys, and his refusal to meet with mental health experts prove his incompetency. In addition, Grattan asserts that Dr. Hagan's evaluation was inadequate

17

because he performed no testing and declined to give an opinion as to whether Grattan suffers from a mental illness.

In contrast, the Commonwealth contends that the circuit court heard the testimony of both expert and lay witnesses and observed Grattan first-hand on several occasions. The Commonwealth further argues that the circuit court, as the fact finder, was entitled to accord more weight to testimony of Dr. Hagan than to the testimony of Grattan's expert witnesses. Thus, according to the Commonwealth, the circuit court's finding that Grattan failed to prove by a preponderance of the evidence that he was incompetent to stand trial was not plainly wrong or without evidence to support it. We agree with the Commonwealth.

As the party asserting incompetency to stand trial, Grattan had the burden of proving such by a preponderance of the evidence. Code § 19.2-169.1(E). A defendant is considered competent to stand trial if he has the capacity to understand the criminal proceedings against him and is able to assist counsel in his defense. Id.; see also Godinez v. Moran, 509 U.S. 389, 396 (1993) (stating that the standard for competency is whether the defendant has " 'sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding' and has 'a rational as well as factual understanding of the proceedings against him' ") (quoting

18

Dusky v. United States, 362 U.S. 402, 402 (1960) (per curiam)). Therefore, to prove incompetency, a defendant must show by a preponderance of the evidence that he either lacks the capacity to understand the criminal proceedings against him or lacks the ability to assist counsel in his defense.

A trial court's determination of a defendant's competency to stand trial is a question of fact and will not be reversed on appeal unless it is plainly wrong or without evidence to support it. Orndorff v. Commonwealth, 271 Va. 486, 500, 628 S.E.2d 344, 351 (2006); see also Code § 8.01-680. We view the evidence in the light most favorable to the Commonwealth as the prevailing party on this issue in the circuit court. Orndorff, 271 Va. at 500, 628 S.E.2d at 352.

At the hearing to determine Grattan's competency to stand trial, the circuit court heard conflicting expert testimony. As we have previously stated, " '[c]onflicting expert opinions constitute a question of fact' " and it is "within the province of the finder of fact . . . 'to assess the credibility of the witnesses and the probative value to be given their testimony.' " Riner v. Commonwealth, 268 Va. 296, 329-30, 601 S.E.2d 555, 574 (2004) (quoting Mercer v. Commonwealth, 259 Va. 235, 242, 523 S.E.2d 213, 217 (2000)). Like the competency determination itself, this question of fact will not be disturbed on appeal unless it is plainly

19

wrong or without evidence to support it.  Mercer, 259 Va. at 243, 523 S.E.2d at 217.

Based on the evidence in this case in light of these established principles, we conclude that the circuit court's determination that Grattan was competent to stand trial was not plainly wrong or without evidence to support it.  Dr. Hagan, who qualified as an expert in forensic and clinical psychology, concluded that Grattan "possess[ed] an understanding of the charges against him" and "the capacity to assist not only in trial preparation but to have a presence in court."  In reaching this conclusion, Dr. Hagan relied on jail records, the evaluations of both Dr. Ryan and Dr. Cohen, his personal observations of Grattan in court and in jail, and his seventy-four minute interview with Grattan.

As Grattan points out, his expert witnesses reached contrary conclusions.  It is also true that Dr. Hagan expressed no opinion as to whether Grattan suffers from a mental illness.  Dr. Hagan stated that whether Grattan was mentally ill was "not determinative of the issue."  Moreover, Dr. Ryan acknowledged that an individual could be mentally ill but yet competent to stand trial.

Additionally, both testifying experts, Dr. Hagan and Dr. Ryan, criticized the evaluation methods of the other.  For example, Dr. Hagan criticized the test used by Dr. Ryan to

measure Grattan's understanding, reasoning, and appreciation because the test utilizes "fictitious scenarios unrelated to his case."  Dr. Ryan, however, considered the test appropriate because it "separate[s] the individual from his or her crime and make[s the evaluation] less anxiety provoking."  Dr. Ryan criticized Dr. Hagan for conducting his interview of Grattan in a courtroom in the presence of deputies.  Dr. Hagan maintained there were no professional guidelines against having others in the evaluation room and that the deputies did not affect the evaluation in any way.  In fact, Dr. Hagan thought Grattan had the ability to learn and modify his behavior because he followed the directions of a deputy who told him not to rock his chair.  Presented with conflicting opinions, the circuit court elected to accord more weight to Dr. Hagan's testimony.  That credibility determination was not plainly wrong or without evidence to support it.  See Mercer, 259 Va. at 243, 523 S.E.2d at 217.

    In addition, the circuit court heard lay testimony concerning Grattan's behavior at various times.  Several deputies testified about Grattan's conduct while in jail, including his appeal from a disciplinary action.  Grattan maintained he had acted in self-defense and requested a witness to testify in support of his claim.  His actions demonstrated, in that instance, he understood the disciplinary

charge and how to defend against it.  The testimony of Grattan's fellow inmate, that Grattan stated he was behaving strangely because it was his only way to get less than twenty years, supported the conclusion that at a minimum, Grattan understood the severity of the charges against him and the role that an insanity defense could play in the sentence he could receive.

Furthermore, in making its competency determination, the circuit court relied on its own observations of Grattan during both the competency hearing and prior court appearances.  The court noted during the January 30 hearing that Grattan appeared competent then and during his prior appearances. When the court made its competency determination, it referenced the six-to-seven hour period it had observed Grattan in open court.  Finally, the court viewed a portion of the video recording of Grattan's interview with Dr. Hagan, from which the court could draw its own conclusions.  In sum, as the Court of Appeals concluded, the record contains sufficient evidence to support the circuit court's determination that Grattan was competent to stand trial.[5]  See Grattan, slip op. at 7.

---

[5] We reach the same conclusion with regard to the circuit court's finding that Grattan was competent to be sentenced.

Nevertheless, Grattan maintains that his refusal to cooperate with the Commonwealth's mental health experts proved he was incompetent.  However, nothing in the statutory competency standard requires a defendant to actually assist himself or counsel in his defense – it merely requires that a defendant have the ability to do so.  See Code § 19.2-169.1(E); Godinez, 509 U.S. at 396.  Thus, we find no reason to disturb the circuit court's determination that Grattan was competent to stand trial and to be sentenced.

B.  Exclusion of Expert Testimony

Under Code § 19.2-168, when a defendant decides to put his sanity at the time of the charged offense in issue and present expert testimony in support thereof, he must notify the Commonwealth.  If the Commonwealth then seeks an evaluation of the defendant's sanity at the time of the offense, a trial court must appoint "one or more qualified mental health experts to perform such an evaluation."  Code § 19.2-168.1(A).  In addition, the court "shall order the defendant to submit to such an evaluation and advise the defendant on the record in court that a refusal to cooperate with the Commonwealth's expert could result in exclusion of the defendant's expert evidence."  Id. Subsequent to that admonition to the defendant,

23

> [i]f the court finds, after hearing evidence
> presented by the parties, that the defendant has
> refused to cooperate with an evaluation requested by
> the Commonwealth, it may admit evidence of such
> refusal or, in the discretion of the court, bar the
> defendant from presenting expert psychiatric or
> psychological evidence at trial on the issue of his
> sanity at the time of the offense.

Code § 19.2-168.1(B).

Grattan argues the circuit court abused the discretion afforded to it under this statute by invoking the harshest penalty for his refusal to cooperate with the evaluation requested by the Commonwealth, i.e., excluding his expert testimony on the issue of his sanity at the time of the offenses. Grattan claims that his failure to meet with the Commonwealth's mental health experts was a product of his mental illness. He launches a four-prong attack on the circuit court's exercise of its discretion. Grattan first asserts that the court failed to consider what Grattan describes as his "undisputed mental illness" in deciding what remedy to invoke. He next argues that if the court had allowed his mental health experts to testify, the Commonwealth would nevertheless have been able to defend against his claim of insanity because Dr. Harry acknowledged that it was ethically permissible to evaluate a defendant's sanity without the benefit of a personal interview. Third, Grattan contends the court should have considered a less drastic remedy, such

24

as telling a jury about his refusal to cooperate, as provided in Code § 19.2-168.1(B), or admonishing a jury to view Grattan's evidence of insanity with skepticism.  Finally, Grattan argues that, before barring his expert testimony, the court should have found that Grattan's refusal to cooperate with the Commonwealth's mental health evaluators was motivated by strategic reasons or a desire to obstruct justice.

In evaluating whether a trial court abused its discretion, as Grattan contends the circuit court did in this case, "we do not substitute our judgment for that of the trial court.  Rather, we consider only whether the record fairly supports the trial court's action."  Beck v. Commonwealth, 253 Va. 373, 385, 484 S.E.2d 898, 906 (1997); see also Noll v. Rahal, 219 Va. 795, 801-02, 250 S.E.2d 741, 745 (1979) (trial court did not abuse its discretion in disqualifying an expert witness even though "reasonable trial judges could properly disagree" and "some members of this [C]ourt, had they presided at the trial, may have admitted" the testimony); Thomas v. Commonwealth, 44 Va. App. 741, 753, 607 S.E.2d 738, 743 (2005) ("Only when reasonable jurists could not differ can we say an abuse of discretion has occurred.").  " 'The abuse-of-discretion standard [also] includes review to determine that the discretion was not guided by erroneous legal conclusions.' "  Porter v. Commonwealth, 276 Va. 203, 260, 661

S.E.2d 415, 445 (2008) (quoting Koon v. United States, 518 U.S. 81, 100 (1996)). Considering the record before us in light of these principles, we cannot say the circuit court abused its discretion by barring Grattan's introduction of expert testimony in support of his claim of insanity at the time of the offenses.

First, the circuit court's finding that Grattan was competent to stand trial refutes his argument that the court abused its discretion. As we have already stated, competency to stand trial means that a defendant has the capacity to understand the criminal proceedings against him and the ability to assist counsel in his defense. See Code § 19.2-169.1(E); Godinez, 509 U.S. at 396 (the standard of competency is whether a defendant has " 'sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding' and has 'a rational as well as factual understanding of the proceedings against him' ") (quoting Dusky, 362 U.S. at 402). Having found Grattan competent to stand trial, a finding that we have decided was supported by the evidence, it was reasonable for the circuit court to conclude that Grattan understood the court's repeated instructions that he was required to cooperate with the Commonwealth's mental health evaluators and its constant warnings about the potential ramifications of his refusal to

26

do so.[6]   This is especially so when Grattan himself affirmed his understanding of the court's instructions.

Grattan maintains that his refusal, however, was a product of mental illness.  The record does not support that contention. Although Grattan refused to meet with Dr. Ryan several times, he nevertheless met with his own mental health evaluators on four separate occasions.  He also met with Dr. Hagan on January 30, although the evaluation was limited to the question of competency to stand trial.  Grattan cooperated with Dr. Hagan on this one occasion after the circuit court told him in open court to do so and warned him again as to the consequences if he refused.  In addition, while Dr. Ryan and Dr. Cohen opined that Grattan suffers from schizophrenia, they did not explain how that mental illness would account for Grattan's refusal to cooperate with the Commonwealth's mental health evaluators.

In addition to the competency determination, the record contains other evidence that demonstrates the circuit court did not abuse its discretion when it barred Grattan from introducing expert testimony.  For example, Grattan pursued an

---

[6] We note that in McCall v. State, 408 N.E.2d 1218 (Ind. 1980), a case relied upon by Grattan, the trial court never put the defendant on notice that his failure to cooperate could result in the exclusion of expert testimony in support of his insanity defense.  Id. at 1221.

appeal and called for a witness to testify on his behalf when he was charged with a jail infraction. A fellow inmate testified that Grattan stated he was behaving strangely because it was his only chance of receiving less than twenty years of incarceration. Also, Dr. Hagan noted that, during his competency interview, Grattan modified his behavior when a deputy told him to stop rocking his chair. Finally, the circuit court had the benefit of its own observations of Grattan on several occasions and could glean from Grattan's responses, demeanor, and behavior in open court that he, in fact, understood the court's directions to cooperate with the Commonwealth's mental health evaluators and the court's warning that it could bar his own mental health experts from testifying if he failed to do so.

We are not persuaded that the circuit court abused its discretion merely because Dr. Harry indicated that it would be ethically permissible to evaluate Grattan's sanity at the time of the offenses without the benefit of a personal interview. Since Grattan was armed with two sanity evaluations, each based, in part, on lengthy personal interviews with him, the Commonwealth was entitled to have its mental health experts perform their own evaluations based on their first-hand observations of Grattan. We agree with the Commonwealth's assertion that it should not be "saddled with or limited by

28

what [Grattan's] experts did or did not do in their evaluations, or their methodology." Indeed, the provisions of Code § 19.2-168.1 evince the General Assembly's clear intent to provide the Commonwealth with its own evaluation and to allow a trial court to exclude a non-cooperating defendant's expert testimony on the subject, regardless of whether the Commonwealth's experts can formulate an opinion about the defendant's sanity without the defendant's cooperation. As we recognized in Muhammad v. Commonwealth, 269 Va. 451, 619 S.E.2d 16 (2005), the Commonwealth, like the defendant, is entitled to a fair trial, which includes "the right to a fair rebuttal of mental health evidence presented by the defendant." Id. at 507, 619 S.E.2d at 85.

Nor was the circuit court required to consider alternative, less drastic remedies not contemplated by the provisions of Code § 19.2-168.1(B). That subsection provides two possible sanctions when a defendant refuses to cooperate with the Commonwealth's mental health evaluators: admit evidence of the refusal or, in the trial court's discretion, bar the defendant from presenting expert testimony on the subject of sanity at the time of the offense. Code § 19.2-168.1(B). Thus, the circuit court did not abuse its discretion by choosing one of the remedies provided by the statute instead of the non-statutory alternatives suggested by

29

Grattan.  Cf. Taylor v. Illinois, 484 U.S. 400, 413 (1988) ("It may well be true that alternative sanctions are adequate and appropriate in most cases, but it is equally clear that they would be less effective than the preclusion sanction and that there are instances in which they would perpetuate rather than limit the prejudice to the State and the harm to the adversary process.").

Finally, the circuit court was not required to find that Grattan's failure to cooperate with the Commonwealth's mental health experts was motivated by strategic reasons or a desire to obstruct justice.  Such findings are not required by the provisions of § 19.2-168.1(B).  It is a defendant's refusal to cooperate, not his motivations, that is determinative.  Furthermore, as the Commonwealth points out, the circuit court, having found Grattan competent to stand trial, implicitly found that Grattan understood the court's instructions to cooperate with the Commonwealth's mental health evaluators and its warnings about the consequences of failing to do so, thus making his refusal to cooperate intentional.  The fact that he cooperated with his own mental health evaluators also demonstrates that his refusal to cooperate with the Commonwealth's experts was knowing and intentional.

Grattan argues, however, that those defendants who are the "sickest" are the ones most likely to refuse to cooperate with a mental health evaluation. While we do not necessarily disagree, we find Grattan's selective refusal to cooperate telling. We also note that Grattan's expert, Dr. Ryan, acknowledged that Grattan understood the parameters of Dr. Ryan's evaluation and consented to proceed with the evaluation.

We recognize that due process of law affords a defendant the right to present witnesses to establish a defense. See Washington v. Texas, 388 U.S. 14, 19 (1967). "[A] trial court may not ignore the fundamental character of the defendant's right to offer the testimony of witnesses in his favor. But the mere invocation of that right cannot automatically and invariably outweigh countervailing public interests." Taylor, 484 U.S. at 414. "[T]he accused, as is required of the [prosecution], must comply with established rules of procedure and evidence designed to assure both fairness and reliability in the ascertainment of guilt and innocence." Chambers v. Mississippi, 410 U.S. 284, 302 (1973). "The adversary process could not function effectively without adherence to rules of procedure that govern the orderly presentation of facts and arguments to provide each party with a fair opportunity to

assemble and submit evidence to contradict or explain the opponent's case." Taylor, 484 U.S. at 410-11.

While there is no constitutional right to assert an insanity defense in a criminal proceeding, see Commonwealth v. Chatman, 260 Va. 562, 567-68, 538 S.E.2d 304, 306-07 (2000), "Virginia has long recognized the common law defense of insanity." White v. Commonwealth, 272 Va. 619, 625, 636 S.E.2d 353, 356 (2006). The General Assembly, however, has statutorily prescribed the procedure for asserting that defense. See Code §§ 19.2-168 and -168.1. In this case, Grattan did not follow the statutory procedure when he refused to cooperate with the Commonwealth's mental health evaluators. In accordance with the provisions of Code § 19.2-168.1, the circuit court excluded only Grattan's expert testimony on the subject. The court did not prevent Grattan from introducing relevant lay testimony. In fact, Grattan proffered evidence from his family, fellow inmates, and police interviews addressing his behavior, demeanor, and mental state. In sum, we find no abuse of discretion by the circuit court.

### III. CONCLUSION

For these reasons, we conclude that the circuit court's finding that Grattan was competent to stand trial was not plainly wrong or without evidence to support it. We also conclude the circuit court did not abuse its discretion by

32

barring Grattan's introduction of expert testimony on the issue of his sanity at the time of the offenses.  We will therefore affirm the judgment of the Court of Appeals.[7]

<u>Affirmed</u>.

---

[7] In his only constitutional argument, Grattan asserts that barring his introduction of expert testimony in support of his defense of insanity at the time of the offenses violated his right to call for evidence under the Sixth Amendment and Article I, Section 8 of the Constitution of Virginia.  The Court of Appeals held that Grattan failed to present this argument in the circuit court and therefore defaulted it under Rule 5A:18.  <u>Grattan</u>, slip op. at 9-10. Grattan did not assign error in this Court to the Court of Appeals' application of Rule 5A:18.  Therefore, we will not consider the argument.  <u>See</u> Rule 5:25.