COURT OF APPEALS OF VIRGINIA

Present: Judges Alston, McCullough and Senior Judge Clements
Argued at Richmond, Virginia


CHRISTOPHER ALLEN BRANTLEY

                                                MEMORANDUM OPINION[*] BY
v.        Record No. 0883-14-2               JUDGE JEAN HARRISON CLEMENTS
                                                   SEPTEMBER 22, 2015
COMMONWEALTH OF VIRGINIA


FROM THE CIRCUIT COURT OF AMELIA COUNTY
Paul W. Cella, Judge

        T.L. Marsh for appellant.

        Elizabeth C. Kiernan, Assistant Attorney General (Mark R. Herring,
        Attorney General, on brief), for appellee.


        In a bench trial, Christopher Allen Brantley (appellant) was convicted of abuse and

neglect of a child in violation of Code § 18.2-371.1.  Appellant argues on appeal the evidence

was insufficient to prove beyond a reasonable doubt that he caused the physical condition

exhibited by V.B. on April 15, 2012 or that V.B.'s condition resulted from child abuse.  We find

the evidence was sufficient to support the conviction and affirm.

                                   BACKGROUND

        "On appeal, 'we review the evidence in the light most favorable to the Commonwealth,

granting to it all reasonable inferences fairly deducible therefrom.'"  Archer v. Commonwealth,

26 Va. App. 1, 11, 492 S.E.2d 826, 831 (1997) (quoting Martin v. Commonwealth, 4 Va. App.

438, 443, 358 S.E.2d 415, 418 (1987)).

_____

        [*] Pursuant to Code § 17.1-413, this opinion is not designated for publication.

On April 15, 2012, three-month-old V.B. lived with her mother, Heather Powell, and her father, appellant. In the preceding two days, V.B. had been in the care of only Powell, appellant, and Powell's elderly grandmother. According to Powell, V.B. had "bad acid reflux," but on April 13 and 14, V.B. took her bottles "like she normally did." Powell said that when V.B. was taking formula from a bottle, sometimes the liquid came out of the left side of her mouth.

Before 7:00 a.m. on April 15, Powell left the house for work. Appellant and V.B. remained at home, and appellant was the infant's caregiver. At about 2:00 p.m. on April 15, paramedics were called to the home where appellant and Powell lived. The paramedics transported V.B. to Chippenham Hospital. Later that day V.B. was transferred to VCU Children's Hospital because medical findings had raised suspicions of child abuse.

A CT scan of V.B.'s brain performed at Chippenham Hospital on April 15 revealed "an acute on chronic subdural hematoma in the right frontal region of the brain." A subdural hematoma is a collection of blood beneath the lining of the skull but above the brain tissue. The acute subdural hematoma was incurred at some point during the seventy-two hours before its discovery. There was no evidence of other bruising or skeletal damage to V.B.'s body.

Dr. Jennifer Fuchs, a pediatric resident physician at VCU hospital, spoke with appellant and Powell on April 16. Appellant said that he tried to feed V.B. at around noon on April 15. V.B. had become fussy, and she would take only about one-half ounce. She also would not take her pacifier. After he put the baby down for a nap, appellant said he heard her make an "ah" sound, and went to check on her. Appellant said he then found V.B. stiff on one side. After paramedics took V.B. to Chippenham Hospital, the baby vomited. Appellant and Powell told Dr. Fuchs there had been about four prior incidents where V.B. had arched or become stiff and vomited, but V.B.'s doctor told them this was likely due to her reflux condition. Appellant and Powell denied that V.B. had sustained a fall or any trauma.

An ophthalmology consultation at VCU revealed that V.B. had intraretinal and preretinal hemorrhages in the right eye. Retinal hemorrhages of that nature were consistent with traumatic injury from a high speed acceleration-deceleration motion, or shaking, but not from a short fall.

Dr. Robin Foster, the director of the child protective team at VCU Hospital, examined V.B. on April 17. Fuchs also was involved in the examination. At that time, the baby repeatedly pushed the pacifier out of her mouth with her tongue, and there was redness around her left eye. An MRI of V.B.'s head on April 16 had revealed a "subacute hematoma" on a "chronic right frontal subdural hematoma." Dr. Foster stated that V.B.'s symptoms of seizure-like activity, poor feeding, and vomiting were consistent with an acute subdural hematoma, and the symptoms would have manifested immediately after the mechanism of injury. The chronic blood collections on V.B.'s skull were less dense and were more than ten to fourteen days in age. Dr. Foster's expert opinion was that V.B. had sustained abusive head trauma.

Dr. Foster stated that nothing in V.B.'s birth records explained the presence of an acute subdural blood collection or the retinal hemorrhages. In Dr. Foster's opinion, the hematomas and hemorrhages found on V.B. were unrelated to injuries that could have occurred during birth. Dr. Foster opined that most subdural hematomas occurring during birth are to the back of the child's head, unlike the hematomas to the front of V.B.'s head, and resolve by the time the child is one month old. Dr. Foster further stated that in thirty percent of cases involving abusive head trauma to a child, retinal hemorrhage was found unilaterally in only one eye.

Dr. Foster stated that "adult strength" would have been required to inflict V.B.'s injury. She explained that the type of force involved typically could not be sustained for more than twenty seconds because it would be physically exhausting to the person performing it. Dr. Foster explained that V.B.'s injury was "indicative of significant trauma to th[e] infant."

At VCU Hospital on April 18, Deputy Ian McDonald questioned appellant about the sequence of events that occurred on April 15 prior to the arrival of the paramedics. Appellant said that he and V.B. awakened at about 7:30 a.m. Powell had already left for work. Appellant fed the baby a bottle, which she drank completely. Appellant and V.B. went back to sleep, and awakened again at 8:30 a.m. V.B. appeared to be behaving normally. Appellant put V.B. in a stroller and took her outside, where he worked on a swing set for several hours. At around noon, V.B. became fussy, so appellant took her inside to feed her again. Appellant gave the baby a bottle, but she did not feed well. Appellant put V.B. in her crib so that she could nap.

Appellant said that while in the kitchen about five to ten minutes later, he heard V.B. make a sound. Appellant went to check on V.B. Appellant told McDonald he found V.B. with a "death stare," pale, and rigid on one side. Appellant picked up V.B., stretched her out, and shook her gently on the chest. Appellant said he became very concerned about V.B.'s condition. He tried to call Powell, as well as a friend, but ultimately called 911.[1]

Powell testified that V.B. was born with swelling and bruising on her head. V.B. also had difficulty feeding, and milk would come out of the left side of her mouth. Powell said that on five or six occasions V.B. had regurgitated and choked while feeding. During these episodes, appellant, using his mouth, would suction V.B.'s mouth and nose so that her breathing could resume.

Dr. Jack Daniel, an expert in the field of forensic pathology, reviewed medical records from V.B.'s birth. Dr. Daniel stated that following her birth V.B.'s head had both a caput, which was a hematoma under the scalp, and a cephalohematoma, a deeper area of bleeding involving the superficial surface of the bone. Before the April 15 incident, V.B. had been diagnosed with

---

[1] On April 20, appellant gave a written statement to the police that was consistent with his oral statement to McDonald.

- 4 -

gastroesophageal reflux disease (GERD) and was being treated with Zantac. Dr. Daniel opined that increased intracranial pressure associated with a choking episode could cause rebleeding in an existing subdural hematoma. Dr. Daniel also stated that abnormal coagulation factors, which were noted from testing V.B. on April 15 and 17, could have caused a subdural hematoma to rebleed. Thus, Dr. Daniel stated, he did not think a rapid shaking event would have been required to cause V.B.'s chronic subdural hematoma to bleed again and present as an acute hematoma. However, Dr. Daniel was unable to exclude abusive head trauma as a cause of V.B.'s acute subdural hematoma and retinal hemorrhage.

Dr. Juan Orellana, an expert in the field of ophthalmology, examined V.B. on June 25. At that time, only one small retinal hemorrhage remained present. Dr. Orellana opined that V.B.'s retinal hemorrhage on April 15 could have been caused by shaking, but that cause was less likely since it was in only one eye. Dr. Orellana also stated that a spasm of choking, and the resulting increased intracranial pressure, could cause a retinal hemorrhage.

In finding appellant guilty, the trial court credited Dr. Foster's testimony regarding the acute hematoma discovered on V.B.'s head on April 15 and that it was not a birth-related injury. Considering the conjunction of the hematoma with the retinal hemorrhage and other symptoms, the trial court found appellant had injured V.B. through child abuse.

## ANALYSIS

Code § 18.2-371.1(A) states that a parent who "by willful act or omission or refusal to provide any necessary care for the child's health causes or permits serious injury to the life or health of such child shall be guilty of a Class 4 felony." Appellant argues that evidence proved V.B.'s symptoms resulted from factors that did not involve criminal conduct. He also claims the evidence was insufficient to exclude a reasonable hypothesis of innocence that he was not the criminal agent of V.B.'s injury.

> Whether the hypothesis of innocence is reasonable is itself a "question of fact," Emerson v. Commonwealth, 43 Va. App. 263, 277, 597 S.E.2d 242, 249 (2004) (citation omitted), subject to deferential appellate review, Kelly [v. Commonwealth], 41 Va. App. [250,] 259, 584 S.E.2d [444,] 448 [(2003) (*en banc*)]. "Merely because defendant's theory of the case differs from that taken by the Commonwealth does not mean that every reasonable hypothesis consistent with his innocence has not been excluded. What weight should be given evidence is a matter for the [factfinder] to decide." Miles v. Commonwealth, 205 Va. 462, 467, 138 S.E.2d 22, 27 (1964)[.]

Haskins v. Commonwealth, 44 Va. App. 1, 9, 602 S.E.2d 402, 406 (2004).

The evidence proved that on April 15, 2012, after V.B.'s admittance to Chippenham Hospital, a CT scan revealed that V.B. had sustained an acute subdural hematoma that was on a chronic subdural hematoma. Dr. Foster opined that the acute hematoma had been sustained within seventy-two hours of the CT scan, and the onset of symptoms would have been immediate. Nausea and poor feeding were among those symptoms. V.B. appeared normal when Powell left for work at 7:00 a.m. on April 15, but the child exhibited both symptoms after spending several hours in the sole care of appellant. Thus, the evidence supported the trial court's conclusion that it was appellant who caused V.B.'s acute subdural hematoma.

In addition, the Commonwealth's expert testimony, which the trial court credited, supported the conclusion that V.B.'s acute subdural hematoma and retinal hemorrhaging were caused by abusive head trauma, not by circumstances relating to V.B.'s birth or a subsequently diagnosed medical condition. As Dr. Foster testified, the injuries V.B. manifested could have resulted from a violent incident of shaking, not from a short fall. "'[C]onflicting expert opinions constitute a question of fact'" and it is "within the province of the finder of fact . . . 'to assess the credibility of the witnesses and the probative value to be given their testimony.'" Grattan v. Commonwealth, 278 Va. 602, 617, 685 S.E.2d 634, 642 (2009) (quoting Riner v. Commonwealth, 268 Va. 296, 329-30, 601 S.E.2d 555, 574 (2004)). See also Cavazos v. Smith,

132 S. Ct. 2 (2011) (where there was conflicting expert opinion testimony regarding the cause of the child's death, appellate court erred in reversing defendant's conviction and finding the child was not a victim of shaken baby syndrome). We find no basis to disturb the trial court's decision to credit the Commonwealth's expert opinion testimony that V.B.'s condition resulted from abusive head trauma, and to conclude that appellant was guilty beyond a reasonable doubt of child abuse.

CONCLUSION

For the foregoing reasons, we affirm appellant's conviction.

Affirmed.