COURT OF APPEALS OF VIRGINIA

UNPUBLISHED

Present: Judges Malveaux, Athey and Senior Judge Petty


SHANNON LACOLE HOUSTON

                                                    MEMORANDUM OPINION*
v.        Record No. 0001-24-3                           PER CURIAM
                                                     JANUARY 28, 2025
ROANOKE COUNTY DEPARTMENT
   OF SOCIAL SERVICES


FROM THE CIRCUIT COURT OF ROANOKE COUNTY
James R. Swanson, Judge

(John S. Koehler; The Law Office of James Steele, PLLC, on brief),
for appellant.

(Marta J. Anderson, Senior Assistant County Attorney; Kelli C.
Boyer, Guardian ad litem for the minor child; Boyer Law, PLC, on
brief), for appellee. Appellee and Guardian ad litem submitting on
brief.


Shannon Lacole Houston ("Houston") appeals from an order entered in the Circuit Court of

Roanoke County ("circuit court") terminating her parental rights to her minor child, K.C.[1] During

closing argument on the second day of the two-day trial, Houston moved for a continuance so that

she could obtain evidence showing that her positive drug screens resulted from her taking

prescribed medication. The circuit court denied her motion. On appeal, Houston contends that the

circuit court erred by denying her requested continuance. Finding no error, we affirm.[2]

---

* This opinion is not designated for publication. *See* Code § 17.1-413(A).

[1] We use initials to protect the identity of the minor child.

[2] After examining the briefs and record in this case, the panel unanimously holds that oral argument is unnecessary because "the appeal is wholly without merit." Code § 17.1-403(ii)(a); Rule 5A:27(a).

I. Background[3]

Upon the petition of the Roanoke County Department of Social Services (the "Department") and after a hearing on October 26, 2022, the Roanoke County Juvenile and Domestic Relations District Court ("JDR court") entered an order terminating Houston's parental rights to K.C. under Code § 16.1-283(C) and a permanency planning order approving the goal of adoption for K.C.[4] Houston timely appealed the decision to the circuit court. The trial de novo took place over the course of two days: August 10, 2023, and November 22, 2023.

The parties convened on the first day for the limited purpose of introducing evidence regarding potential American Indian heritage of the child consistent with the federal Indian Child Welfare Act and for the additional purpose of authenticating Houston's drug test reports. Houston's hair and urine drug screens were admitted in evidence as business records—Houston's only objections to their entry were hearsay. To authenticate the records reflecting the results of the tests, the Department called several witnesses. The first two witnesses were the custodians of records for the two labs that tested Houston's hair and urine samples: Omega Laboratories and MedTox. The third witness was Tim Fitzgerald ("Fitzgerald"),[5] who served as the president and records custodian of Safety and Compliance ("SC"), the "consulting and drug testing firm" that collected samples of Houston's hair and urine necessary to perform the drug screens. Fitzgerald testified that the hair screens were sent to Omega Laboratories for testing and that the urine samples were initially tested

---

[3] The record in this case was sealed. "To the extent that this opinion mentions facts found in the sealed record, we unseal only those specific facts, finding them relevant to the decision in this case. The remainder of the previously sealed record remains sealed." *Levick v. MacDougall*, 294 Va. 283, 288 n.1 (2017).

[4] The permanency planning order was entered on October 26, 2022, and the termination of parental rights order was entered on March 17, 2023.

[5] Fitzgerald is referred to at times in the transcript as "Tim Montgomery" or "Mr. Montgomery." Because both parties on brief refer to him as "Tim Fitzgerald," we employ the surname used on brief.

on-site and if positive, were sent to MedTox for confirmation. Fitzgerald further stated that SC did not normally inquire concerning a donor's prescription medications and that in most social services cases, SC used a "[n]on-MRO" test "so we can see the levels." Furthermore, he testified that if the results were positive and a donor "says well I have a legitimate prescription for that," then the test is sent to a medical review officer who "will touch base with that person and verify that prescription if need be." However, he noted, "[m]ost of the time when we are looking at something like methamphetamines there is no prescription, so because there is no prescription there is no reason to involve the medical review officer." When asked about whether prescription medications could cause false positives for methamphetamine, he testified that he was not aware of any doctors prescribing methamphetamine. Lastly, Fitzgerald testified that "[t]here are levels but with methamphetamines itself, if you have amphetamines and you have methamphetamines currently to my knowledge there is no physician writing a prescription for that."

On the second day of trial, the circuit court heard testimony from several other witnesses. The Department called Ardis Gregory ("Gregory"), "a licensed professional counselor in adult child and family therapy," who testified that on February 3, 2022, she conducted a substance abuse assessment of Houston upon a referral from the Department. Gregory testified that during the assessment, Houston self-reported last using methamphetamine in August of 2021. Gregory also confirmed that Houston acknowledged that she had since failed a drug screen by testing positive for methamphetamine and self-reported that failure to the Department. Gregory further testified that Houston "met diagnostic criteria for substance abuse disorders" and as a result, she recommended outpatient treatment. Gregory then testified that she had scheduled several appointments with Houston for outpatient treatment, but Houston only attended the first appointment, cancelled her second appointment, and was a "no show no call no cancel" for her third appointment. Following

her noncompliance, Gregory testified that she removed the remainder of the scheduled appointments from her calendar.

Victoria Church ("Church"), a child protective services investigator supervisor employed by the Department, then testified that on November 3, 2021, the Department filed a petition for removal of K.C., based on a phone call relaying "[d]rug concerns."[6] As a result, she testified, the Department requested that Houston perform a hair screen, which subsequently tested positive for methamphetamine. At the time of the phone call, Houston was residing in a hotel, and K.C. was present in the hotel room when the Department arrived at the hotel. Church testified that there were also concerns about Houston's mental health based on her increasingly erratic and agitated behavior during a subsequent home visit. On cross-examination, Church acknowledged that the call received by the Department reported that drug dealing was occurring—not drug use. Church also acknowledged that no drugs were found on the premises, no individuals on the premises confirmed that they purchased or received drugs from Houston, and Houston was not convicted of distribution or possession of drugs based on the Department's visit at the hotel.

The Department's final witness, Danita Tucker ("Tucker"), was the supervisor for the Department's foster care team.[7] Tucker testified that after K.C. was physically removed, the Department created a service plan to reunite K.C. with Houston. As a part of that plan, the Department recommended that Houston complete a substance abuse evaluation and complete any recommended treatment arising from the evaluation. Although Houston completed the initial

---

[6] The investigator who responded to Houston's residence was no longer employed by the Department at the time of the trial. Church testified that she was the record keeper for the Department's investigation team and that she had reviewed the affidavit of the investigator who had responded to the call of concern.

[7] The initial case manager was no longer employed by the Department at the time of trial, but Tucker testified that as the supervisor of the foster care team, she was familiar with the case. She also testified that she was the custodian of records for the foster care team.

evaluation component, Tucker—after Houston denied repeated attempts and requests for a release of information concerning any subsequent recommended treatment—was unable to verify whether Houston had completed any recommended treatment. The service plan also included a parental capacity evaluation, but Houston failed to attend the scheduled parental evaluation. The service plan also provided for drug screens "in order to ensure sobriety." Tucker testified that Houston tested positive for methamphetamine at every screen in which she participated from November 5, 2021, to July 24, 2023. Tucker further testified that Houston had obtained housing but was unable to verify whether she was employed. When asked why the Department was seeking approval for the goal of adoption, Tucker responded that K.C. "needs permanency" and noted that she could neither verify that Houston was participating in substance abuse treatment nor whether Houston was employed. Furthermore, she emphasized that Houston had "not maintained sobriety throughout the life of the case" and that Houston was "still testing positive for methamphetamines and amphetamines."

Houston testified on her own behalf, stating that she had never dealt drugs, nor had she been charged with possession or distribution of illegal substances since the case began. When asked to explain her positive tests for methamphetamines and amphetamines, she stated that the results were caused by a "diet pill" prescribed by her primary care physician "because of my obesity and my health."[8] Houston also testified that the diet drug was a stimulant and that it was her understanding that it could cause a positive result for methamphetamines and amphetamines. Houston further testified that the Department had never asked her to sign a release so it could access her prescription records and that every time she went in for a drug screen, she took her prescriptions with her—but "they said [sic] never needed them." When asked whether she would be willing to sign any waivers for the Department that day, she replied, "Yes, absolutely." Houston further testified that when she

_____

[8] She further stated that the drug was "Adipex," generic for "Phentremine."

discussed her positive drug screens with the Department, she explained that she had a prescription, but that the Department never asked her for a waiver or inquired any further. When asked whether she had considered stopping the medication, she stated that she would "if that is all it takes but no one has said nothing to me about it. Like, I am lost when it comes to stuff like this. I get scared to ask questions sometimes, but also, I can't just stop taking it." She also stated that it could affect her health because she is allergic to sodium and she would "swell up"—to the extent that when asked whether "it is life threatening if you stop taking this medication," she responded, "To a point. It can be."

On cross-examination, Houston noted that she had not brought her physician to testify at the de novo trial—because she "didn't know [she] needed to." However, she stated that she had asked her physician to write a letter to her lawyer about the medicine she was taking and that—as far as she knew—the letter was sent to her attorney.

The circuit court then asked her whether she had her prescription bottle with her, to which she responded that she did not. She testified that she had used the medication for the past 15 years "on and off," and she stated that the prescription was for "one month, 30 days at a time." According to Houston, her most recent prescription was issued at the end of September of 2023. She testified that she could get refills for three months by calling the pharmacy, but she had to go back in person "every three months" to see her doctor for the prescription to be renewed. The circuit court further inquired into her basis for believing that the medication was causing her positive result for methamphetamine. She responded that her belief was based on "[t]he pamphlet you receive, my doctor, and what I've done research on, asking CVS, the pharmacist on my own." She stated that she had discussed the issue with her attorney, but that she was told that the evidence showing that the prescription could cause positive tests "was not admissible in court, it is hearsay, just because of me having a piece of paper." The circuit court remarked that "if there is some legitimate basis for

your belief of these positive, these false positives, then we would hear something about it beyond your unsubstantiated assertion," to which Houston responded that she could not afford an expert witness. To follow up, the circuit court asked whether she had talked with her doctor about the issue and if she had asked for him to help her show a connection between her medication and the positive results. Houston responded, "No. I mean, I don't know. I've asked to discuss it but I don't know what else to do. I'm new to this stuff, like -- I don't get it." The circuit court reminded her that, although she was not a lawyer or legally trained, she was "not new to this stuff" and asked whether she had ever considered if there was "some mechanism to establish the basis for [her] false positives." She responded that she thought it was enough to take her prescriptions with her to the screens and to disclose the prescription to the social worker.

During closing arguments, counsel for Houston asked for a continuance "limited for the sole purpose of whether or not she can provide documentation of this prescription that she has had for 15 years . . . within [60] days." Counsel argued that allowing 60 days for her to produce evidence of her prescription would "explain[] the methamphetamine prescription positive," making "this case . . . a completely different case." The circuit court again asked "why hasn't that been done up to this point?" Houston's counsel responded, "I don't want to go into attorney client privilege communications but we don't have it today." He further stated that Houston did not have the funds to hire an expert witness but maintained that if she signed a waiver, the Department could have access to more information about the drug. Lastly, Houston's counsel added, "If she can't provide it, if she won't sign the waivers, if she can't get the evidence to the court or the Department between now and then, the case is over."

The Department opposed a continuance, stating that this "[wa]s not a case . . . that has not had ample opportunity to bring up any issues that are necessary." The Department noted that on the first day of the trial, each custodian of records for the laboratories at which the drug screens were

processed testified and that it was the Department's position that "if a test shows a result of methamphetamine it is because they are testing for methamphetamine." Further, the Department argued that the first day of trial—when the record custodians were testifying—"would have been the appropriate time to address that issue."

Following closing argument, the circuit court first denied Houston's request for a continuance, opining that it was "unpersuaded by Ms. Houston's assertion of this false positive produced by her diet medication," and noted the "numerous opportunities" Houston had to address the issue. The circuit court then concluded "that the inference from her failure to [ad]duce evidence is that the evidence doesn't exist, showing this connection." The circuit court also found that the "continual . . . positive testing for methamphetamine use, failure to comply with the appropriate assistance measures taken by DSS over the course of this case, the lack of cooperation . . . insofar as the parental capacity evaluation, and follow up with the substance abuse with Ardis Gregory" supported the termination of her parental rights as being in the best interests of K.C. The circuit court further found that the Department had proven "by clear and convincing evidence that the basis for removal in this case ha[d] not been remedied within a reasonable period of time" and that it had been well in excess of twelve months since the removal of K.C. Based thereon, the circuit court held that termination of Houston's parental rights was appropriate, and the circuit court further approved changing the foster plan goal to adoption. On December 14, 2023, the circuit court entered a final order terminating Houston's parental rights under Code § 16.1-283(C)(2) and approving "[t]he foster care plan with the permanent goal of adoption." Houston appealed.

## II. ANALYSIS

### A. *Standard of Review*

The denial of a continuance is reviewed on appeal for an abuse of discretion and resulting prejudice to the moving party, "in view of the circumstances unique to each case." *Haugen v.*

*Shenandoah Valley Dep't of Soc. Servs.*, 274 Va. 27, 34 (2007). "The circuit court's ruling on a motion for a continuance will be rejected on appeal only upon a showing of abuse of discretion and resulting prejudice to the movant." *Id.* "The abuse of discretion standard 'rests on the venerable belief that the judge closest to the contest is the judge best able to discern where the equities lie.'" *Bailey v. Commonwealth*, 73 Va. App. 250, 265 (2021) (quoting *Hamad v. Hamad*, 61 Va. App. 593, 607 (2013)). "Accordingly, 'we do not substitute our judgment for that of the trial court. Rather, we consider only whether the record fairly supports the trial court's action.'" *Id.* (quoting *Grattan v. Commonwealth*, 278 Va. 602, 620 (2009)).

B. *The circuit court did not err by denying Houston a continuance.*

Houston assigns error to the circuit court's denial of her request for a continuance.[9] She contends that the circuit court "erred in not providing [her] an opportunity to present evidence that her positive drug screens were the result of her taking validly prescribed prescription medication and not illicit drug use." She further maintains that because the "sole allegation made against [her] was that she abused illicit drugs and that this could potentially cause her to be unable to provide appropriate care for [K.C.]," the circuit court's denial of her request for a continuance resulted in prejudice to her, as she was unable to establish that the positive drug tests resulted from her prescription medications. For the following reasons, we disagree.

First, we find no abuse of discretion in the circuit court's denial of the requested continuance. Under this deferential standard of review, *see Bailey*, 73 Va. App. at 265, we note that the circuit court, after hearing testimony from Houston, was "unpersuaded" by her explanation for testing positive for methamphetamine use. Additionally, "[i]n determining whether the trial court properly exercised its discretionary powers, we look to the diligence exercised by the moving party

---

[9] Houston does not challenge the sufficiency of the evidence underlying the order terminating her parental rights or approving the foster care plan with the goal of adoption.

to gather and make the evidence available at trial." *Smith v. Commonwealth*, 16 Va. App. 630, 636 (1993). Houston had at least two opportunities—with more than three months in between the two trial days—to produce evidence of her prescription and testimony that her prescribed medication could cause a positive result for methamphetamine on a hair or urine screen. When she failed to do so, the circuit court asked if she could, at the very least, show the court her prescription bottle—she was unable to produce the medication when provided the opportunity to do so by the court. Houston, who was represented by counsel, did not secure the attendance or testimony of her prescribing physician, despite having notice of the de novo trial.[10] Moreover, on the first day of trial, both parties questioned one of the records custodians about whether prescription medication could cause a positive test result for methamphetamine, to which the custodian indicated—without objection—that "[m]ost of the time when we are looking at something like methamphetamines there is no prescription" and that "to my knowledge there is no physician writing a prescription for [methamphetamine]." Thus, Houston had notice that her positive results for methamphetamine would be at issue and had over three months to produce evidence that her medication caused the positive result. Due to Houston's failure to diligently make such evidence available to the circuit court, we cannot find that the circuit court abused its discretion by denying her requested continuance.

Furthermore, we find no resulting prejudice due to the circuit court's denial of the requested continuance. "While justice, not speed, should be paramount in determining whether a continuance will be granted, the court is not obligated to grant a continuance based on mere speculation." *Smith*,

---

[10] For her part, we note that Houston testified that she had her physician send a letter to her attorney. However, such letter was not offered in evidence. The circuit court did not err by concluding that her failure to adduce evidence indicated that such favorable evidence did not exist. *Cf. Robinson v. Commonwealth*, 207 Va. 66, 69 (1966) ("It is true that the failure of a party to call a material witness frequently raises a presumption that his testimony would not have been favorable to such party.").

16 Va. App. at 634-35. While Houston indicated that she would be willing to sign a waiver allowing the Department to review her medical records, whether this would show that she had a prescription or whether the prescription *caused* the positive results is speculative. So too is whether her prescribing physician's testimony would have been favorable to her assertion. *Cf. Stewart v. Commonwealth*, 10 Va. App. 563, 569 (1990) (holding that where a trial court's denial of a continuance "prevented [the defendant] from interviewing a potentially valuable witness who might have been able to discredit" another witness's identification of him, the trial court did not abuse its discretion because the request was "based on mere speculation" and there was "nothing in the record to indicate he was deprived of favorable or exculpatory evidence"); *Smith*, 16 Va. App. at 637 ("The trial court could only speculate as to the potential value of the unavailable test results and guess whether it 'might' be of assistance 'if' it could be produced."). In other words, even if Houston produced evidence that she was taking a prescribed medication that *could* cause a false positive test, there is no indication in the record that she would have been able to prove that taking such medication—and not illicit drug use—*in fact caused* her positive tests. This, in addition to the fact that she had months to produce such evidence, requires us to conclude that she suffered no prejudice as a result of the circuit court's denial of her requested continuance.

### III. CONCLUSION

For the foregoing reasons, we find no error. We thus affirm the judgment of the circuit court.

*Affirmed.*

- 11 -