COURT OF APPEALS OF VIRGINIA

Present:    Judges Beales, Causey and Senior Judge Petty
Argued by videoconference


JOHN TUCKER HARDEE
                                                    MEMORANDUM OPINION[*] BY
v.        Record No. 0969-23-1                      JUDGE DORIS HENDERSON CAUSEY
                                                    JANUARY 14, 2025
COMMONWEALTH OF VIRGINIA


FROM THE CIRCUIT COURT OF THE CITY OF NORFOLK
John R. Doyle, III, Judge

Kristin Paulding (7 Cities Law, on brief), for appellant.

Matthew J. Beyrau, Assistant Attorney General (Jason S. Miyares,
Attorney General, on brief), for appellee.


Following a bench trial, the circuit court convicted John Tucker Hardee of malicious

wounding, child abuse or neglect, and felony homicide.  The circuit court sentenced Hardee to 45

years of imprisonment with 10 years suspended.  Hardee argues that the circuit court erred in

allowing the Commonwealth to introduce evidence of prior criminal or bad acts against the victim.

He also challenges the sufficiency of the evidence to sustain his convictions.[1]  Finding no error, we

affirm the circuit court's judgment.

---

[*] This opinion is not designated for publication.  *See* Code § 17.1-413(A).

[1] On brief, Hardee withdrew an assignment of error relating to the adequacy of his
preliminary hearing.

BACKGROUND

On appeal, "we review the evidence in the 'light most favorable' to the Commonwealth."[2]

*Clanton v. Commonwealth*, 53 Va. App. 561, 564 (2009) (en banc) (quoting *Commonwealth v.*

*Hudson*, 265 Va. 505, 514 (2003)).  That principle requires us to "discard the evidence of the

accused in conflict with that of the Commonwealth, and regard as true all the credible evidence

favorable to the Commonwealth and all fair inferences that may be drawn therefrom."  *Kelly v.*

*Commonwealth*, 41 Va. App. 250, 254 (2003) (en banc) (quoting *Watkins v. Commonwealth*, 26

Va. App. 335, 348 (1998)).

In April 2018, Shelby Love, Love's two-year-old daughter H.W., and John Tucker

Hardee lived in a two-bedroom apartment in Norfolk along with an apartment-mate, Timothy

Lineberry.  Love and Hardee were dating and had been living together for around two months.

Hardee, Love, and H.W. shared one bedroom in the apartment, and Lineberry lived in the other

bedroom.  Love worked during the day for the City of Virginia Beach's social services division.

Hardee worked inconsistently.  Love sent H.W. to a daycare during the day while she worked or

left H.W. at home with Hardee.  In April 2018, Love became ineligible for governmental

benefits that helped pay for H.W.'s daycare.  H.W. last attended daycare on April 16, 2018.

During the period when Love was not sending H.W. to daycare, Hardee stayed home and

watched H.W.

Love described her relationship with Hardee as "extremely abusive."  She said that she

"always feared" Hardee.  At one point in April 2018, Love moved out of the apartment, taking

---

[2] Some portions of the record in this case were sealed.  "[T]his appeal requires unsealing certain portions to resolve the issues raised by the parties."  *Mintbrook Devs., LLC v. Groundscapes*, *LLC*, 76 Va. App. 279, 283 n.1 (2022).  We unseal only the facts recounted in this opinion; the rest of the sealed portion of the record remains sealed.  *Id.*

H.W. with her to a domestic violence shelter. But after Hardee confronted her, Love returned to the apartment the next day.

On April 3, 2018, Love went to work and left H.W. in Hardee's care. In the midst of an argument over text, Hardee sent Love a picture of swelling around H.W.'s eye and complained about having to take her out in public in that condition. He explained that H.W. had fallen and hit her eye on a "little frame." Love said, "She don't have black eyes when I'm home." Hardee replied, "Just keep babying your baby and keep the umbilical cord attached." Hardee then sent Love a video showing H.W. with a number of bruises on her body, including on her abdomen.

On April 19, 2018, Hardee sent text messages to Love indicating that he had given H.W. "a good spanking" for "ripp[ing]" a curtain off the wall. He also said that he "popped" her because she poured juice on the floor while he was in the bathroom.

There were also ongoing problems involving hot water at the apartment. The pilot light would often go out, which would lead the hot water and heating to go out. Additionally, the water temperature sometimes became too hot during showers, though Love described these fluctuations as not "that extreme." Numerous complaints about the pilot light going out were filed with management, but none were registered about the water being too hot.

Love testified that she had never seen Hardee bathe H.W., though Lineberry, the apartment-mate, testified that Hardee would sometimes bathe H.W. H.W. was capable of climbing into the bathtub and turning on the water by herself.

I. The Burning Incident

On April 23, 2018, as she was leaving work for the day at about 4:30 p.m., Love received a text message from Hardee stating, "I am going to prison." He urged her to "[h]urry home."

When she reached the apartment, H.W. was shaking and on top of Hardee; Love described H.W. as "severely burned." H.W.'s skin was red and blistering, and layers of skin

- 3 -

were coming off. Love also thought she saw "splash marks." Love testified that she began screaming, and Hardee begged her not to break up with him. Hardee told Love that he had left H.W. in the bathtub by herself while he made a phone call. He told her that he had heard H.W. whining, returned to check on her, and found that she had burned herself.

Love testified that she told Hardee that they needed to take H.W. to the hospital. Hardee responded that he could not do that because he would go to prison. Love then said that she could not "get another [H.W.]." Hardee then threatened to kill Love if she tried to take H.W. to the hospital. Love "complied with his wishes." Using Facebook, Hardee obtained advice from a nurse about how to treat H.W.'s injuries.

Hardee went to the drug store for items to treat H.W.'s injury. Love testified that she did not call 911 in his absence from the apartment because she was "scared" of him. Text messages at about 7:25 p.m. indicated that Hardee was at a drug store and purchasing gauze, Vaseline, "wound gel," and other items. At 7:33 p.m., Hardee sent a text saying, "This is my fault for walking out but I can't take fault for that water turning hotter for no real reason. But if you want to still go to the hospital I will take the responsibility."

With Hardee's help that evening, Love gave H.W. Tylenol and tried to ease the child's pain using a burn gel containing lidocaine, Vaseline, and gauze. Because it was a home remedy that had helped Love's ex-husband with a burn injury, she also applied diluted apple cider vinegar to the child's wounds.

When Lineberry got home from work that evening, Love and Hardee were "tending" to H.W. but Lineberry did not realize the severity of the situation. Love went to sleep near H.W. and set an alarm to awaken every hour and a half to check on the child and change her dressing.

At 3:30 a.m., Love woke up to find Hardee putting the burn gel on H.W. and changing her dressing. H.W. was lethargic, and her eyes were closed. Then, H.W. began shaking, her

- 4 -

eyes rolled back, and she had a seizure. Love attempted CPR on the child and told Hardee to call 911.[3]

At 3:38 a.m., Hardee called 911 two times in quick succession. Julie Hughes, a firefighter and paramedic, arrived on the scene several minutes after the first call. Love was holding H.W. in her arms and was on the top steps of the apartment. H.W. was grunting, seizing, and unresponsive. While transporting H.W. to the hospital, Hughes administered Versed, an anti-seizure medication. Hughes did not administer lidocaine on the way to the hospital.

H.W. had severe partial thickness burns to the back of her legs below the knees. The outer layer of skin had "blistered off." The burns extended across H.W.'s back, buttocks, left upper arm, the back of the ears, right hand, and lower arm. There was bruising to H.W.'s neck. By the time she reached the hospital, H.W. had no pulse and was not breathing, and she was pronounced dead.

## II. The Investigation

After H.W.'s death, the police measured the temperature of the hot water in the apartment at 130 and 134 degrees. The hot water heater was set just below "very hot."

At her death, H.W.'s blood contained a toxic, and potentially fatal, level of lidocaine, which was contained in the wound gel that Hardee and Love administered to the child. The lidocaine was present in H.W.'s body long enough to metabolize from the blood to the liver. Seizures, convulsions, and cardiac arrythmia were consistent side effects of that level of lidocaine in the body. According to the trial testimony of a toxicology expert, the application of the lidocaine onto areas with a missing layer of skin would have made the lidocaine absorb into

---

[3] Love, who testified against Hardee, pleaded guilty to charges of felony murder and child abuse or neglect; she received no promises of leniency in return for her trial testimony.

H.W.'s body faster. Additionally, the application of vinegar to H.W.'s burns would have exacerbated the burn.

During H.W.'s autopsy, the medical examiner noted burns over 30 to 33% of the child's body. The burns were at least deep partial thickness burns. The external epidermis had "completely sloughed" in a majority of the burns. The medical examiner determined the cause of H.W.'s death to be "complications of scalding." She explained that this referred to a probable "relationship between the fact that she was burned and the presence of the lidocaine."

In addition to the burns, the autopsy showed that H.W. had suffered blunt force injuries to her body. H.W. was bruised on the back of the head, other parts of the head, eyebrow, torso, and right ear. The medical examiner concluded that the bruising was not incurred in a single episode. The dimensions of the bruise on the back of the head measured seven by three and one-half inches. There was bruising of the small internal mesentery caused by blunt force trauma to the abdomen. Sustaining a mesenteric hematoma, according to expert testimony presented in the trial, required a high amount of force because the mesentery is not firmly fixed in place.

Dr. Amber L. Shipman, who attended H.W.'s autopsy, testified as an expert in the field of pediatric child abuse. She testified that it was "extremely atypical" to find a mesenteric hematoma "in an otherwise active child without a history of some type of significant abdominal injury." Dr. Shipman opined that the bruise to H.W.'s ear was "an atypical injury where a child would not accidentally injure" herself and would be considered "inflicted trauma." The scalp injuries, chest bruising, and right ear injury were "a part of multiple impacts."

Dr. Shipman estimated that 42% of H.W.'s body surface was burned. The burns involved her left arm, the entire back, buttocks, and the backs of both legs. The burns did not involve the front of H.W.'s body. Dr. Shipman testified:

> Children who are burned accidentally in a bathtub or hot
> water who are otherwise developmentally normal would try to get

away from painful stimuli because it hurts. When they try to move away from this, it causes the water to move around a lot. They tend to splash the water. This leads to variable burn patterns because the body is not in the water for the same amount of time, and they tend to have other areas that are burned from the splashes.

[H.W.'s] burns are uniform, the same depth, covering a large surface of her body, which suggests she was immobile when she was burned.

In addition to H.W. having been immobile, Dr. Shipman said that H.W.'s burns indicated that H.W. was not in a seated position when she was burned, due to the absence of burns to the front of her body, including the lower abdomen and vaginal area. In addition, there were no "running water" patterns in the burns to suggest that she was under flowing water. And if H.W. had fallen backwards into hot water, Dr. Shipman would have expected splash patterns from where the water was displaced, but Dr. Shipman found no evidence of splash patterns on H.W.'s body. Dr. Shipman found "no plausible accidental explanation" for H.W.'s burns. Dr. Shipman concluded that H.W.'s injuries were "not consistent with a child left alone in a bathtub."

Dr. Shipman stated that H.W. "required aggressive medical care" for her burns, but that if treated there was "a very high chance that she would have survived her injuries potentially with minimal complications." Dr. Shipman thus concluded that H.W.'s death "was a result of not seeking medical care." Dr. Shipman added that it would have taken less than a minute for H.W. to sustain the burns at a water temperature between 130 and 134 degrees. Dr. Shipman also said that the bruise on H.W.'s abdomen shown by the April 3 photographs and video, without any plausible accidental explanation, was consistent with inflicted trauma.

### III. Circuit Court Findings

In finding Hardee guilty, the circuit court credited the medical evidence and rejected his claim that H.W. was burned accidentally. The circuit court concluded that Hardee intentionally injured the child by immersing her in the hot water and causing the burns. For this act, the

circuit court found Hardee guilty of malicious wounding, for "causing intentionally and with malice a cruel act, causing this child to lay in scalding hot water for a sufficient period of time to inflict these burns." The circuit court further found that Hardee had made the decision not to call 911 and had done so "because he thought that might imperil him of going to prison because of what had occurred." For this willful failure to provide necessary medical care, the court found Hardee guilty of felony child neglect. Finally, the court found that H.W.'s "death ensued clearly as a result of the felony child neglect decision" of not seeking medical care. Therefore, the court found Hardee guilty of felony homicide. This appeal followed.

ANALYSIS

I. Motion *In Limine* Regarding H.W.'s Prior Injuries

Hardee contends that the circuit court erred in granting the Commonwealth's motion *in limine* seeking to offer evidence of his "prior criminal conduct" toward H.W. The circuit court granted the Commonwealth's motion *in limine* permitting the Commonwealth to offer evidence of prior criminal acts, which included text messages sent between Hardee and Love on April 3, 2018, as well as a photograph and video[4] that Hardee sent Love that day, showing swelling and redness around H.W.'s eye, bruising on her legs and right arm, and bruising on her abdomen.

A. Standard of Review

The decision by a circuit court on the admissibility of evidence is reviewed for abuse of discretion. *See Jackson v. Jackson*, 69 Va. App. 243, 247 (2018), *aff'd*, 298 Va. 132 (2019). An abuse of discretion occurs "when a relevant factor that should have been given significant weight is not considered" or "when an irrelevant or improper factor is considered and given significant weight." *Landrum v. Chippenham & Johnston-Willis Hosps., Inc.*, 282 Va. 346, 352 (2011) (quoting *Kern v. TXO Prod. Corp.*, 738 F.2d 968, 970 (8th Cir. 1984)). The court also abuses its

_____

[4] Only screen captures from the video were ultimately introduced at trial.

discretion when it commits a clear error of judgment, even if considering "all proper factors, and no improper ones." *Id.* (quoting *Kern*, 738 F.2d at 970). "In evaluating whether a trial court abused its discretion, . . . '[this Court does] not substitute [its] judgment for that of the trial court. Rather, [this Court] consider[s] only whether the record fairly supports the trial court's action.'" *Carter v. Commonwealth*, 293 Va. 537, 543 (2017) (first alteration in original) (quoting *Grattan v. Commonwealth*, 278 Va. 602, 620 (2009)).

"The abuse-of-discretion standard [also] includes review to determine that the discretion was not guided by erroneous legal conclusions." *Id.* at 543-44 (alteration in original) (quoting *Porter v. Commonwealth*, 276 Va. 203, 260 (2008)). "Only when reasonable jurists could not differ can we say an abuse of discretion has occurred." *Lambert v. Commonwealth*, 70 Va. App. 740, 749 (2019) (quoting *Thomas v. Commonwealth*, 44 Va. App. 741, 753, *adopted upon reh'g en banc*, 45 Va. App. 811 (2005)). "That standard means that the [trial] court judge's 'ruling will not be reversed simply because an appellate court disagrees.'" *Fields v. Commonwealth*, 73 Va. App. 652, 672 (2021) (quoting *Thomas*, 44 Va. App. at 753). In conducting this analysis, this Court views "the evidence in the light 'most favorable to the Commonwealth as the prevailing party on this issue in the [trial] court.'" *Id.* (quoting *Grattan*, 278 Va. at 617).

B. Applicable Law

Under the Virginia Rules of Evidence, "'[r]elevant evidence' means evidence having any tendency to make the existence of any fact in issue more probable or less probable than it would be without the evidence." Va. R. Evid. 2:401. "All relevant evidence is admissible" except as otherwise excluded by constitution, statute, rule of court, or other evidentiary principles. Va. R. Evid. 2:402.

One type of evidence that courts must exclude under the rules is that of a defendant's past criminal or bad acts, if introduced to show the defendant's character and demonstrate that the

defendant acted in accordance with that character. Va. R. Evid. 2:404(b) ("[E]vidence of other crimes, wrongs, or acts is generally not admissible to prove the character trait of a person in order to show that the person acted in conformity therewith."). On the other hand, if evidence of past bad acts is relevant for other purposes, "such as where it is relevant to show motive, . . . , intent, . . . , absence of mistake, [or] accident," and the probative value outweighs its prejudicial effect, such evidence "is admissible." *Id.* In cases in which "the motive, intent, or knowledge of the accused is involved," past bad acts evidence can be admissible "if it shows the conduct and feeling of the accused toward his victim, if it establishes their prior relations, or if it tends to prove any relevant element of the offense charged." *Pavlick v. Commonwealth*, 27 Va. App. 219, 226 (1998) (en banc) (quoting *Kirkpatrick v. Commonwealth*, 211 Va. 269, 272 (1970)). It may also be admitted to show malice. *See id.* at 227. Past bad acts evidence, in any circumstance, is only admissible if its probative value outweighs its prejudicial effect on the accused. *Id.* at 226.

In numerous cases, appellate courts applying these rules have concluded that evidence showing that a defendant previously caused harm—or attempted harm—to his alleged victim was properly admitted as relevant to show the defendant's ultimate intent or malice, his conduct and feeling towards the victim, or his past relations with the victim.[5] In particular, the Supreme Court of Virginia and this Court have affirmed admission of such evidence in numerous cases when it showed that a defendant charged with a crime against a child had previously abused that

---

[5] *See, e.g.*, *Keyes v. Commonwealth*, 39 Va. App. 294, 303-04 (2002) (evidence that defendant charged with sending a threatening letter previously attempted to rape intended recipient of letter was admissible to show defendant's intent and identity); *Callahan v. Commonwealth*, 8 Va. App. 135, 141-42 (1989) (evidence that defendant charged with arson of family home previously assaulted wife and child was admissible to show defendant's motive and intent); *Gibson v. Commonwealth*, 216 Va. 412, 415-16 (1975) (evidence that man charged with murdering his wife had previously shot at wife and children was properly admitted to show conduct and feelings towards his wife).

same child. *See Pavlick*, 27 Va. App. at 225-30 (evidence that defendant charged with murder by shaking his infant son had previously caused the child head and rib injuries was properly admitted because relevant to show malice); *Moore v. Commonwealth*, 222 Va. 72, 75-77 (1981) (evidence that defendant charged with sex crimes against a child sexually abused the same child both before and after the incidents in question was properly admitted because relevant to the question of lascivious intent); *Evans v. Commonwealth*, 215 Va. 609, 614 (1975) (evidence that defendant charged with murder of his four-year-old stepson had previously struck the child was properly admitted because relevant to show defendant's intent to cause serious bodily harm to the child, his feelings toward the child, and a pattern of conduct leading to the child's death).

This Court has also held, though, that the relevance of past criminal or bad acts evidence to these non-propensity purposes depends on a showing that the defendant committed the bad acts. *See Pavlick*, 27 Va. App. at 227. In assessing this predicate fact, this Court has appeared to approve of the standard applied in the federal courts, in which the trial judge does not assess witness credibility or make a factual finding him or herself, but instead asks whether a finder of fact "could reasonably find the conditional fact . . . by a preponderance of the evidence." *Id.* at 227-29 (alteration in original) (quoting *Huddleston v. United States*, 485 U.S. 681, 690 (1988)) (holding that because the predicate fact that the defendant previously harmed a child depended on a witness who was not inherently incredible, the trial court did not err in admitting evidence of the harm). The Supreme Court of Virginia has also cited this standard. *See Prieto v. Commonwealth*, 283 Va. 149, 172-73 (2012) (citing *Pavlick*, 27 Va. App. at 227).

C. Evidence

The evidence available to the trial judge at the motion *in limine* stage included the April 3rd texts, photograph, video, and an expert medical report and testimony. The messages showed that Hardee sent Love the photograph and video of H.W.'s bruises after an hours-long exchange

of texts beginning before 8:00 a.m., in which Hardee and Love argued about multiple topics. Early in the argument, Hardee wrote, "Poor Shelby always the victim but runs her s— mouth and expects anything less" and called Love a "compulsive liar." Love called Hardee "an abusive man." A central topic of discussion was Hardee's anger at Love for having left H.W. with him while Love was at work that day. At 11:33 a.m., Hardee sent multiple consecutive text messages in which he called Love "[s]elfish" for waking him up and leaving H.W. in his care on that day. At 12:25 p.m., before Love had replied, Hardee texted again, writing that Love did not care that Hardee would have to take H.W. out in public and face criticism with H.W.'s "eye like that." At 12:27 p.m., Love replied, "I'll take the day off tomorrow and stay with the kids." At 12:30 p.m., Hardee sent a text along with a photograph of H.W.'s face showing swelling around her eye, writing, "Look at her mother f— eye man. This s— is embarrassing man!!!! I've gotta take her out in public like this all cus you wouldn't take her to f— school and you left 10 mins early WHAT GIVES!!!!!!"

At 12:31 p.m., Love responded by sending text messages reading, "Wtf that's bad John" and "I won't leave her home with you anymore then don't flip out." At 12:34 p.m., Hardee sent a text message explaining that H.W.

> fell hard on her eye on the corner of the little frame. When I walked out to the truck looking for my keys that you stole to be an a— she was asleep how the f— am I supposed to know she standing in front of the door when I come back up less then 5 mins later.

After several minutes of arguing, Love wrote at 12:39 p.m., "She don't have black eyes when I'm home." Hardee responded immediately, "Just keep babying your baby and keep the umbilical cord attached."

Love then wrote at 12:40 p.m., "I guess I'll just send [the picture] over to [names of third parties][6] and see what they think about that." Hardee wrote back at 12:40 p.m., "Already told [a third party mentioned in the text] so I don't give a f— do what you do." At 12:41 p.m., Hardee wrote, "You trying to make it sound like I did something to her." From 12:41 p.m. to 12:43 p.m., Hardee sent three messages, which read as follows, immediately followed by a video.

> How about this video I got of her the other day that I didn't want to send to you
>
> I guess I beat her right???? Hats [sic] what the f— your [sic] trying to say ?????
>
> Look at this that she kept saying earlier today

As the Commonwealth's attorney noted at the motion *in limine* hearing, Hardee's statement about the timing of the video shifted from "the other day" to "earlier today" from the first to the third text. The video, according to Dr. Shipman's report attached to the motion *in limine*, showed the child with swelling around her eye, bruises to her legs and right arm, and bruising on her abdomen.

At 12:45 p.m., Hardee sent more text messages with regard to the video he had sent that read, "Listen to her saying you be hitting her" and "Wtf is that madness." Hardee then wrote, "She keeps pointing her hand when she says you hit her though. I think she talking about when you smack her hand." Love responded by stating that she had never hit H.W. in a way that left marks, only "slapp[ing] her hand very gently . . . to get her to not touch things that could be dangerous" like Hardee's tools. Hardee then said, "Look I'm not ever gonna accuse you of hurting or beating her." Over the course of the next hour, Hardee sent Love a number of

---

[6] The record did not clearly explain the identity of the people referred to in the texts.

additional texts expressing his concern that people would suspect him of beating H.W. because of her bruises.

Along with their motion *in limine*, the Commonwealth submitted a report from Dr. Amber L. Shipman, who viewed the photograph and video that Hardee sent to Love on April 3, 2018. Dr. Shipman reported that the photograph showed swelling around H.W.'s eye and that the video showed bruising on H.W.'s legs, right arm, and abdomen. Dr. Shipman also reported that Hardee was speaking in the video, asking, "Mama hurt you?" and "Mama hit you?" but that H.W.'s replies, including "Mama [inaudible] me," were not clear. Dr. Shipman stated that the swelling and redness around the eye could have been caused by "inflicted trauma," but that Hardee's explanation that H.W. hit her eye on the corner of a picture frame was a "plausible accidental history." She also found that the bruises on H.W.'s legs and arm could be "the result of normal play." But she explained that "Abdominal bruises are uncommon in accidental injury, and when present, are highly concerning due to the possibility of underlying organ injury." Dr. Shipman concluded that "In the absence of a plausible accidental history, the bruising seen on [H.W.'s] abdomen is diagnostic of inflicted trauma."

On June 4, 2019, at the motion *in limine* hearing, Dr. Shipman said that without indication of a non-accidental cause, the eye injury "raises my concern for a non-accidental injury" because it is unlikely to happen due to a fall, but she also said that the explanation involving falling into a picture frame could plausibly explain the swelling. She then reaffirmed that while the bruises to H.W.'s legs and arm were consistent with normal play, the bruising on H.W.'s abdomen raised her concern. Dr. Shipman added that, when performing H.W.'s autopsy, she discovered bruising on H.W.'s mesentery, which is "highly suspicious for inflicted trauma." Seeing H.W.'s abdominal bruise in conjunction with the evidence of non-accidental internal injury raised her level of concern.

At the motion *in limine* hearing, the defense attorney argued that there was insufficient evidence to tie the injuries to Hardee and that the evidence was highly prejudicial to Hardee. The Commonwealth's attorney argued that there was sufficient evidence of this connection and that the evidence was therefore relevant. The Commonwealth's attorney stressed, among other things, Hardee's "belittl[ing]" H.W. and "complain[ing] about her," Hardee's inconsistent statements about the video's date, the fact that the video appeared to show H.W. being "coached," and Dr. Shipman's analysis that the abdominal injury was unlikely to have been caused accidentally.

D. Analysis

The evidence available to the trial judge in this case was sufficient for a predicate finding that Hardee caused H.W.'s prior injuries. Dr. Shipman's testimony established a high probability that the abdominal injury was caused intentionally. The text messages showed that Hardee sent Love a photo and video showing Love's child with bruising over much of her body while expressing fury at Love for making him responsible for caring for that same child. They also showed Love repeatedly implying that she believed Hardee was responsible for the child's injuries. After the first such implication, Hardee appeared to dismiss not Love's accusation, but her level of concern, writing, "Just keep babying your baby and keep the umbilical cord attached." When Love again implied that Hardee was responsible for H.W.'s black eye, Hardee first suggested denial, writing, "You trying to make it sound like I did something to her," but then sent Love another video of her child with more bruises, including a bruised abdomen, without providing any explanation for those bruises. Hardee's text messages leading up to the video contained an inconsistency; where his first text said the video was from "the other day," another said it was from "earlier today." And while the texts show Hardee saying that H.W. had accused Love of hitting her, Hardee said he would not himself accuse Love of hurting H.W.

A reasonable factfinder could have found, first, by relying on expert testimony, that at least some of the injuries to H.W. had been intentionally inflicted. A reasonable factfinder could have then turned to circumstantial evidence in this case, including Hardee's demeanor as shown by the texts and video, Hardee's expressions of resentment and lack of concern for the child, Love's suggestions that Hardee was responsible for the injury coupled with Hardee's initially dismissive response, and Hardee's inconsistent statements of the video's timing—to conclude that Hardee was more likely than not to be lying when he denied causing the injuries. It was not a "clear error of judgment," *Landrum*, 282 Va. at 352 (quoting *Kern*, 738 F.2d at 970), for the trial judge in this case to determine that a reasonable factfinder *could* have found the weight of this evidence sufficient to implicate Hardee under the applicable standard of proof. *See Pavlick*, 27 Va. App. at 227 (quoting *Huddleston*, 485 U.S. at 689-90); *Prieto*, 283 Va. at 172-73 (citing *Pavlick*, 27 Va. App. at 227); *Landrum*, 282 Va. at 352 (quoting *Kern*, 738 F.2d at 970) (abuse of discretion standard requires showing of a clear error of judgment).

In particular, we are reluctant to second-guess the conclusions of the trial judge where he had the opportunity to view the video that Hardee sent of himself sitting with H.W. and repeatedly asking her if Love had hit her. Whether, as the Commonwealth's attorney argued at the motion *in limine* stage, the video tended to show H.W. being "coached" is a question that would hinge on interpretation of Hardee and H.W.'s demeanor in the video. This is a determination that the trial court, in the context of all the evidence that had been presented, was best positioned to make.[7]

---

[7] We also conclude, in the alternative, that even if the trial court had erred in granting the Commonwealth's motion *in limine*, that error would have been harmless in this case. "[E]videntiary errors are subject to non-constitutional harmless error review." *Jones v. Commonwealth*, 71 Va. App. 70, 91 (2019). This Court and the Supreme Court "will not reverse a trial court for evidentiary errors that were harmless to the ultimate result." *Carter*, 293 Va. at 544 (quoting *Shifflett v. Commonwealth*, 289 Va. 10, 12 (2015)). In Virginia, we have recognized that a judge, acting as factfinder, is uniquely suited to avoid the sway of potentially

- 16 -

Because the evidence was sufficient to support a predicate finding that Hardee intentionally caused H.W.'s injury in the past, it was relevant to show that Hardee acted with malice and the intent to cause harm to H.W. on April 23, 2018, including by establishing Hardee's conduct and feelings toward H.W. and showing their prior relations. *See Pavlick*, 27 Va. App. at 227; *Moore*, 222 Va. at 75-77; *Evans*, 215 Va. at 614. And it was not error to find that the probative value outweighed the risk of unfair prejudice. Though prejudice could result from the text messages' depiction of Hardee as abusive, and from the upsetting image of a bruised child, evidence that Hardee previously caused H.W.'s injuries had significant probative value to show intent and malice by establishing his conduct and feelings toward the child and their past relations.

## II. Sufficiency of the Evidence

Hardee challenges the sufficiency of the evidence to sustain his convictions. "On review of the sufficiency of the evidence, 'the judgment of the trial court is presumed correct and will not be disturbed unless it is plainly wrong or without evidence to support it.'" *Ingram v. Commonwealth*, 74 Va. App. 59, 76 (2021) (quoting *Smith v. Commonwealth*, 296 Va. 450, 460 (2018)). "The question on appeal, is whether 'any rational trier of fact could have found the

---

prejudicial evidence. "A judge, unlike a juror, is uniquely suited by training, experience and judicial discipline to disregard potentially prejudicial comments and to separate, during the mental process of adjudication, the admissible from the inadmissible, even though he has heard both." *Eckhart v. Commonwealth*, 222 Va. 213, 216 (1981). "Consequently," we have said, "we presume that a trial judge disregards prejudicial or inadmissible evidence." *Cole v. Commonwealth*, 16 Va. App. 113, 116 (1993). And "this presumption will control in the absence of clear evidence to the contrary." *Id.* (quoting *Hall v. Commonwealth*, 14 Va. App. 892, 902 (1992) (en banc)). In this case, the record contains no indication that the trial judge considered the evidence admitted pursuant to the motion *in limine* for any improper purpose or that it had any bearing on his ultimate decision. The trial judge explained that his decision followed from the medical evidence, Love's testimony, and Hardee's text messages from the date of the burning. Because this was a bench trial and there is no evidence that the trial judge considered the evidence for an improper purpose, we presume he did not do so. *Id.* Consequently, even if there were any error in granting the motion *in limine*, it would have been harmless.

essential elements of the crime beyond a reasonable doubt.'" *Id.* (quoting *Yoder v. Commonwealth*, 298 Va. 180, 182 (2019)). "If there is evidentiary support for the conviction, 'the reviewing court is not permitted to substitute its own judgment, even if its opinion might differ from the conclusions reached by the finder of fact at the trial.'" *Chavez v. Commonwealth*, 69 Va. App. 149, 161 (2018) (quoting *Banks v. Commonwealth*, 67 Va. App. 273, 288 (2017)).

A. Malicious Wounding

In his next assignment of error, Hardee argues that "the trial court erred in finding the appellant guilty of malicious wounding because there was insufficient evidence of malice." He argues that the evidence supported a finding that H.W.'s injuries were the result of an accident. Hardee was indicted for aggravated malicious wounding under Code § 18.2-51.2 but convicted of the lesser-included offense of malicious wounding because the trial court found insufficient evidence that H.W.'s injuries would have caused "permanent and significant physical impairment" if she had survived her burns. Code § 18.2-51.2(A). Malicious wounding, defined by Code § 18.2-51, applies whenever "any person maliciously. . . wound[s] any person or by any means cause[s] him bodily injury, with the intent to maim, disfigure, disable, or kill."

"Malice inheres in the doing of a wrongful act intentionally, or without just cause or excuse, or as a result of ill will." *Burkeen v. Commonwealth*, 286 Va. 255, 259 (2013) (quoting *Dawkins v. Commonwealth*, 186 Va. 55, 61 (1947)). "Whether or not an accused acted with malice is generally a question of fact and may be proved by circumstantial evidence." *Palmer v. Commonwealth*, 71 Va. App. 225, 237 (2019) (quoting *Canipe v. Commonwealth*, 25 Va. App. 629, 642 (1997)). "[M]alice may be either express or implied by conduct." *Watson-Scott v. Commonwealth*, 298 Va. 251, 256 (2019) (quoting *Essex v. Commonwealth*, 228 Va. 273, 280 (1984)).

The trial judge in this case explained that he found Hardee guilty of malicious wounding "for the act of causing intentionally and with malice [the] cruel act[] [of] causing this child to lay in scalding hot water for a sufficient period of time to inflict these burns." There was ample evidence for the court to conclude beyond a reasonable doubt that Hardee had intentionally forced H.W. to lie still in the burning water, and the court was entitled to infer from this act that Hardee acted with malice.

Central to the court's finding that Hardee forced H.W. to lie immobile was Dr. Shipman's expert medical testimony. Dr. Shipman stated that H.W.'s burns' uniform depth and absence of splash marks indicated that H.W. had been immobile in the water when she was burned. The absence of burns around H.W.'s lower abdomen and vaginal area indicated that H.W. was not seated when she was burned. The burns' patterns were inconsistent with H.W. having been under flowing water. And the burns' lack of irregular edges and absence of splash marks were inconsistent with H.W. having fallen backward into the water. Dr. Shipman explained the significance of the evidence that H.W. was immobile by stating, "Children who are burned accidentally in a bathtub or hot water who are otherwise developmentally normal would try to get away from painful stimuli because it hurts." Dr. Shipman said that for any person, "it would be very atypical not to remove yourself from a burning stimulus." Dr. Shipman concluded that "[H.W.'s] injuries are not consistent with a child left alone in a bathtub." Having reviewed the evidence, Dr. Shipman stated, "I found no plausible accidental explanation for the burns seen on [H.W.]."

Dr. Shipman's testimony, in the context of the evidence as a whole, was more than sufficient for the trial court to conclude beyond a reasonable doubt that Hardee had caused H.W.'s burns by forcing her to remain immobile in the bathtub's scalding hot water. Hardee had been tasked with watching H.W. when she was burned, and there was never any indication that

any other adult was home during the day at the time of her injuries. Hardee evidently was present immediately after H.W. was burned, as per his 4:30 p.m. text that read, "I'm going to prison." And the only explanation consistent with Dr. Shipman's expert medical analysis was that someone had forced H.W. to remain immobile in a tub filled with still, scalding water. Based on this information, the trial court was entitled to conclude, beyond a reasonable doubt, that Hardee forced H.W. to remain immobile in the scalding bathtub. *See Williams v. Commonwealth*, 52 Va. App. 194, 201 (2008) (conviction on the basis of circumstantial evidence permissible only if the evidence is "consistent with guilt and inconsistent with innocence and must exclude every reasonable hypothesis of innocence" (quoting *Feigley v. Commonwealth*, 16 Va. App. 717, 724 (1993))). That Hardee's 4:30 p.m. text read, "I'm going to prison," was only a further indication of this sequence of events.

Additionally, having concluded that Hardee caused H.W.'s burns by forcing her to remain immobile in a scalding bathtub, the trial court was entitled to conclude that Hardee acted with malice. *See Palmer*, 71 Va. App. at 237 ("Whether or not an accused acted with malice is generally a question of fact and may be proved by circumstantial evidence."). The act of intentionally causing a two-year-old child to lie immobile in a burning bathtub for a sufficient length of time to cause deep second-degree burns is hard to square with any state of mind less than conscious awareness of the pain being inflicted. It was therefore reasonable for the trial court to infer that Hardee did "a wrongful act intentionally, or without just cause or excuse, or as a result of ill will." *Burkeen*, 286 Va. at 259 (quoting *Dawkins*, 186 Va. at 61). The evidence was sufficient to support a conviction for malicious wounding.

B. Child Neglect

The circuit court found Hardee guilty of child abuse or neglect for refusing to provide H.W. necessary medical care after she was burned. On appeal, Hardee contends that the

evidence does not show that he willfully refused to provide necessary care to H.W. because the efforts he did undertake to treat H.W. at home show that he did not "refuse" to provide care, because the efforts he took were reasonable based on the information he had, and because H.W.'s death resulted from the care that Hardee and Love provided, not their refusal to provide care.

Felony child neglect occurs when a "parent, guardian, or other person responsible for the care of a child under the age of 18 . . . by willful act or willful omission or refusal to provide any necessary care for the child's health causes or permits serious injury to the life or health of such child."  Code § 18.2-371.1(A).  "To be willful, conduct 'must be knowing or intentional, rather than accidental, and be done without justifiable excuse, without ground for believing the conduct is lawful, or with a bad purpose.'"  *Jones v. Commonwealth*, 272 Va. 692, 699 (2006) (quoting *Commonwealth v. Duncan*, 267 Va. 377, 384 (2004)).  "The terms 'bad purpose' or 'without justifiable excuse,' while facially unspecific, necessarily imply knowledge that particular conduct will likely result in injury or illegality."  *Ellis v. Commonwealth*, 29 Va. App. 548, 554 (1999).

First, there was ample evidence for the trial court to conclude that Hardee acted "willful[ly]" in the sense that the failure to provide care was "'knowing or intentional, rather than accidental.'"  *Jones*, 272 Va. at 699 (quoting *Duncan*, 267 Va. at 384).  The evidence supported the trial court's finding that Hardee refused to permit Love to take H.W. to the hospital out of his own self-interest.  As the trial court found, Hardee's 4:30 p.m. text reading, "I'm going to prison," showed that Hardee "immediately was thinking only of himself."  The next piece of evidence that the trial judge considered was that the defendant did not himself call 911 for at least 45 minutes while he was waiting for Love to return home.  These two pieces of evidence, as the trial judge found, were "completely consistent" with Love's account that Hardee did not want

to call 911.  Next, Love testified that when she returned home, she told Hardee that H.W. needed to go to the hospital, but Hardee said that H.W. could not because he would go to prison, and subsequently threatened to kill Love; so, Love submitted to Hardee's wishes.  And finally, the phrasing of Hardee's text at 7:33 p.m., reading, "if you want to still go to the hospital I will take the responsibility," further corroborated Love's account that she had initially wanted to go to the hospital, and Hardee had not.  The fact that Hardee showed openness to changing his mind after letting three hours pass, during which he actively prevented H.W. from receiving necessary medical care, does not undermine the showing of intentionality.

Further, the evidence supported a finding that Hardee, in preventing H.W. from going to the hospital, acted with the knowledge that doing so would "likely result in injury or illegality." *Ellis*, 29 Va. App. at 554.  First, Hardee's initial response, "I'm going to prison," showed his awareness of the seriousness of the situation.  Second, H.W.'s physical appearance, according to Love, was severe and would have made it clear that she required professional medical care: her skin was coming off and was blistering and red, and H.W. was "shaking."  Medical testimony established that at least 30% of H.W.'s skin was burned.  The evidence was sufficient to support a finding that Hardee knew, when he forbade Love to call 911, that going to the hospital was "necessary care" and that not doing so would "likely result in injury or illegality." *Ellis*, 29 Va. App. at 554.  The fact that Hardee helped Love apply home remedies does not undercut the fact that he must have known that professional care was needed.

Finally, the evidence clearly showed that the decision not to take H.W. to the hospital caused H.W.'s death.  Dr. Shipman testified as follows: "As a result of being left at home, [H.W.] died from her injuries.  If [H.W.] had sought medical care, there is a very high chance that she would have survived her injuries potentially with minimal complications.  So in the absence of any plausible explanation, this is diagnostic of medical neglect."  Dr. Shipman also

said that H.W.'s death "was a result of not seeking medical care." The medical examiner determined that the cause of H.W.'s death was the interaction between H.W.'s severe burns and the application of lidocaine onto those burns. Hardee's argument that the cause of H.W.'s death was therefore not their *omission* to obtain care, but their *provision* of care, fails under principles of proximate cause.

In Virginia, an act is a proximate cause if it is "an act or omission that, in natural and continuous sequence unbroken by a superseding cause, produces a particular event and without which that event would not have occurred." *Brown v. Commonwealth*, 278 Va. 523, 529 (2009) (quoting *Williams v. Joynes*, 278 Va. 57, 62 (2009)). "An intervening event, even if a cause of the death, does not exempt the defendant from liability if that event was put into operation by the defendant's initial criminal acts." *Commonwealth v. Jenkins*, 255 Va. 516, 521 (1998) (citing *Gallimore v. Commonwealth*, 246 Va. 441, 447 (1993)).

In this case, Hardee's criminal act of preventing Love from obtaining professional medical care for H.W. put into operation a natural and continuous sequence in which Hardee and Love attempted to treat serious burns without the professional medical care that Hardee knew the burns needed. Therefore, Hardee and Love applied burn cream directly onto deep second-degree burns, leading to the development of a toxic level of lidocaine in H.W.'s body—a risk that Love and Hardee did not know to avoid, but which providers of the professional care that Hardee knew H.W. needed would have known to avoid. Hardee and Love's flawed, dangerous attempt to render care was not a superseding cause that exempts Hardee from liability, but "[a]n intervening event . . . put into operation by" the initial, conscious criminal decision not to seek the needed, professional care. *Jenkins*, 255 Va. at 521. There was sufficient evidence to support the trial judge's finding of proximate causation, and Hardee's conviction for felony child neglect under Code § 18.2-371.1(A).

C. Felony Homicide

Hardee was convicted of felony homicide under Code § 18.2-33, under which "[t]he killing of one accidentally, contrary to the intention of the parties, while in the prosecution of some felonious act other than those specified in Code §§ 18.2-31 and 18.2-32, is murder of the second degree." Felony child abuse or neglect is a felonious act other than those specified in Code §§ 18.2-31 and 18.2-32. Hardee contends the evidence was insufficient to prove felony homicide because H.W.'s death did not occur during the commission of child neglect. As noted above, the evidence was sufficient for a factfinder to conclude that Hardee was guilty of child neglect. Thus, we need not consider this issue further on appeal.

CONCLUSION

For the foregoing reasons, the circuit court's judgment is affirmed.

*Affirmed.*

Petty, S.J., concurring.

I agree that the judgment of the trial court should be affirmed. I cannot, however, join in the opinion's conclusion regarding harmless error as expressed in footnote 7. I consider any discussion of harmless error both unnecessary and unwise given our holding that the trial court did not err in granting the motion *in limine*.

Code § 8.01-678 sets our obligation to consider whether error is harmless. "When it plainly appears from the record and the evidence given at the trial that the parties have had a fair trial on the merits and substantial justice has been reached, no judgment shall be arrested or reversed . . . *for any error committed on the trial*." Code § 8.01-678(2) (emphasis added). The predicate for the application of Code § 8.01-678 is a finding that error has been committed. As we have concluded otherwise, I do not believe it necessary to engage in the hypothetical discussion of whether that alleged error could be considered harmless.

In addition, I think it unwise to engage in alternative holdings.[8] An alternative holding, by definition, is unnecessary to the judgment of the opinion. As such it is dicta.

> This alternative holding was *dicta. See Lofton Ridge, LLC v. Norfolk S. Ry.*, 268 Va. 377, 383 (2004) ("This alternative justification for the ruling was unnecessary to the holding. As such, it is *dicta.*"); *Karsten v. Kaiser Foundation Health Plan*, 36 F.3d 8, 11[ ] (4th Cir. 1994) ("If the first reason given is independently sufficient, then all those that follow are surplusage; thus, the strength of the first makes all the rest *dicta.*"). *Stare decisis*, of course, "cannot be properly applied without 'the need to distinguish an opinion's holding from its *dicta.*'" *Newman v. Newman*, 42 Va. App. 557, 565 (2004) (*en banc*) (citation omitted).

---

[8] Although couched as a conclusion, there can be no doubt that footnote 7 is in fact an alternative holding, given its pronouncement that "even if there were any error in granting the motion *in limine*, it would have been harmless." *Supra* at 16.

*Weeks v. Commonwealth*, 55 Va. App. 157, 163 n.4 (2009). *See also Paxton v. Commonwealth*, 80 Va. App. 449, 468 (2024) ("The subsequent alternative holding . . . was therefore dicta that 'cannot "serve as a source of binding authority."'").

In my opinion, when we incorporate alternative holdings that stray from the opinion's *ratio decidendi*—the essential rationale in the case that determines the judgment—we fail to adhere to our obligation to decide cases on the narrowest grounds possible and we sow confusion among the bench and bar. Therefore, while I concur in the remainder of the opinion, I do not join in footnote 7.