UNPUBLISHED

COURT OF APPEALS OF VIRGINIA

Present: Judges Huff, [*] Ortiz and Raphael
Argued at Norfolk, Virginia

ANTONIO LEE WILLIAMS

MEMORANDUM OPINION[**] BY
v.       Record No. 2164-23-1          JUDGE DANIEL E. ORTIZ
                                       FEBRUARY 25, 2025

COMMONWEALTH OF VIRGINIA

FROM THE CIRCUIT COURT OF THE CITY OF NORFOLK
Everett A. Martin, Jr., Judge

J. Barry McCracken, Assistant Public Defender, for appellant.

Craig W. Stallard, Senior Assistant Attorney General (Jason S.
Miyares, Attorney General, on brief) for appellee.

On July 9, 2021, Antonio Lee Williams undertook a short series of crimes in Norfolk: a

robbery and shooting at a convenience store, and a shooting in an apartment parking lot.

Williams was convicted of second-degree murder, use of a firearm in the commission of a

murder, robbery by using or displaying a firearm, use of a firearm in the commission of a felony,

reckless handling of a firearm, and shooting in a public place. On appeal, Williams contends that

the trial court erred in admitting various pieces of evidence, joining the charges against him, and

denying his motions to strike. Because the evidence was properly admitted, the charges properly

joined, and the motions to strike properly denied, we affirm the trial court's judgment.

---

[*] Judge Huff participated in the hearing and decision of this case prior to the effective date of his retirement on December 31, 2024.

[**] This opinion is not designated for publication. *See* Code § 17.1-413(A).

BACKGROUND

I. Facts

Brenda Villanueva and Griselda Ramirez were working at La Batica Hispanica ("La Batica"), a Hispanic convenience store, the night of July 9th. At about 8:30 p.m., Williams entered the store wearing a green sweatshirt. Williams's head was covered almost entirely by a black hood, except for his eyes. Williams took out a gun and demanded money from Villanueva and Ramirez, who were behind the counter. Ramirez handed Williams the money from the register, which totaled a little over $500. While this was happening, thirteen-year-old Martin Bautista entered the store. Williams said something to Bautista, who did not understand due to a language barrier. Bautista turned, ran from the store, and ran across the street, narrowly avoiding being hit by a car.[1] When Bautista reached the end of the block, he turned and saw Williams exit La Batica and begin to follow him. Bautista turned to "run[] faster to get to [his] house," at which point he heard shots, and he assumed Williams had fired at him. Villanueva did not remember hearing gunshots after Williams exited the store or see where he went.[2]

Shortly thereafter, Keyona Blake was sitting in her truck outside her apartment building on Old Ocean View Drive, smoking a cigarette. Blake was waiting for her husband, Calvin Byas, to come back out of the apartment. While she was waiting, Williams, wearing a white tee shirt and blue "balling shorts," approached Blake's window and asked for a cigarette, which she gave him. Blake testified at trial that no one else was in the parking lot at that time. Byas then came out of the apartment building, and Williams ran around the truck. Blake went into the

_____

[1] Ramirez testified that by the time Bautista ran from the store, she and Villanueva had already given Williams the money. After Williams left the store, Villanueva hurried to lock the door while Ramirez called the police. Both women were particularly shaken as Villanueva was four-months pregnant.

[2] Ramirez was not asked whether she remembered hearing shots or whether she saw where Williams went.

- 2 -

glove compartment for something, and then heard a gunshot. Blake looked up to see Williams run out of the parking lot towards the 7-Eleven. Blake then looked back to Byas, who said, "[O]h, shit, babe, this n****r shot me." Byas fell, and Blake attempted to administer aid to him. Blake called 911, and "went around the corner to the 7-Eleven," "basically following [Williams]." After Williams fled, Blake did not see him again. Calvin Byas died in the emergency room later that night.

Police were called to the 5 Star, La Batica, and Old Ocean View Road. They reviewed surveillance footage from the 5 Star and Old Ocean View Road,[3] and identified a red 1999 Ford Expedition with the license plate "SNL 122" present at both. Police also spoke to Blake and an unknown woman who gave them the nickname "Tone" as a potential lead. Police located the Ford Expedition at about 2:00 a.m. that night, and surveilled it until 5:00 a.m., at which point Williams entered the vehicle and started to drive away. Shortly after, an officer "initiated a traffic stop on [the] probable cause that the [driver had] been identified in the robbery, a shooting, and a homicide." Officers arrested Williams, and he asked someone to get his phone and call his sister. He told an officer he could retrieve it from the center console of the car. When the officer did so, he saw a gun on the driver's side floorboard of the car and a green hoodie in the back seat. Williams was subsequently charged.

## II. Procedural History

### A. Pretrial

Williams was indicted separately for the armed robbery at La Batica and the shooting at Old Ocean View Road.[4] The Commonwealth moved to join the charges under Rule 3A:6(b),

---

[3] Specifically, officers reviewed footage from a 7-Eleven across the street from the apartment building.

[4] Williams was originally charged for a third incident, a shooting at a 5 Star convenience store. The Commonwealth nolle prossed those charges before trial, and the trial court excluded

which allows joinder of offenses when "the offenses are based on the same act or transaction," "the offenses are based on two or more acts or transactions that are connected," or "the offenses constitute parts of a common scheme or plan." It argued that the incidents were connected because they occurred within hours of each other, video from the 5 Star and Old Ocean View Road showed Williams and the Ford Expedition, and shell casings matching Williams's gun were recovered at each location. The Commonwealth reasoned that this evidence was "intertwined" and tended to prove Williams's identity. Williams argued that the charges were for separate and unique incidents and that joinder would be unduly prejudicial. The court ultimately granted joinder because all the crimes "occurred within five hours," "all involved convenience stores," and they "all involved the same gun and the same car."[5]

Before trial, Williams informally moved for the clothing and the gun found in his car to be suppressed, arguing that the officers "did not know why the stop was conducted" and there was no warrant for Williams. The court, citing previous continuances, asked that a written motion be filed but allowed the defense to state the motion orally. Williams continued to argue that there were no exigent circumstances to warrant the stop, or any "traffic infraction or anything of that nature." Detective Jemal Davis testified that police based the stop on surveillance footage and an anonymous tip, both of which had connected Williams and the Ford Expedition to two of the three incidents that evening. The court denied the motion to suppress and explained that it believed probable cause existed for the incident at the "[5 Star on] Wilson

---

shell casings and surveillance footage from the 5 Star. The trial court allowed police to testify, however, that there was a shooting that day at the 5 Star and that surveillance footage from the area identified the car Williams was driving.

[5] The homicide involved a convenience store because the apartment building was near a 7-Eleven. Byas and Williams were both at the 7-Eleven shortly before the shooting.

Road" and "probably probable cause for the homicide as well when you put together the video and the eyewitness"; it further described the investigation as "outstanding police work."

## B. Trial

At trial, Williams objected twice to admission of the Commonwealth's evidence. First, Williams objected to the Commonwealth's proffer of surveillance footage from La Batica. Although defense counsel was provided with stills from the video, the Commonwealth failed to provide the video during discovery and did not share it until three days before trial. The Commonwealth explained that the lateness of the video was due to the retirement or transfer of the original investigating officers to other divisions. The court noted that it was "appalled" at the late introduction of the video, especially considering it had been in the Commonwealth's possession for two years, but allowed two short clips into evidence, as it was no "great prejudice" to Williams.

Williams also objected to admission of the shell casing from Old Ocean View Road, arguing that the Commonwealth failed to establish its chain of custody. Williams argued that the Commonwealth failed to show how the casing got from the crime scene to a secured evidence locker before it was tested. Specifically, "Officer Lynch [said that] he recovered it," and "Officer Allen [said] he took it from the secured locker," but there was no proof of how the casing came to be in the evidence locker. On cross-examination, Lynch stated that he recalled placing the casing in an evidence envelope, but he did not seal or initial it, contrary to procedure. He did, however, state that because of the "severity of the case," his Sergeant "could have just retrieved it from [him] immediately" to take for submission. The court admitted the casing, stating the Commonwealth had "shown enough" and that the defense could argue the matter to the jury.

Finally, Williams moved to strike at the close of the Commonwealth's case, and again at the conclusion of his defense. There was very little argument on the motion to strike either time, and the court denied both motions. The jury convicted Williams of second-degree murder, use of a firearm in the commission of a murder, robbery by using or displaying a firearm, use of a firearm in the commission of a felony, reckless handling of a firearm, and shooting in a public place. The trial court sentenced Williams. He now appeals and asserts that the trial court erred by: (1) admitting evidence Williams claims was the product of an illegal search and seizure, (2) admitting video evidence the Commonwealth submitted after the close of discovery, (3) admitting evidence for which Williams claims the Commonwealth failed to establish chain of custody, (4) joining the charges, and (5) denying Williams's motions to strike.

## ANALYSIS

I. The trial court did not err in denying Williams's motion to suppress evidence obtained during the traffic stop.

Williams first argues that there was insufficient probable cause for officers to arrest him during the traffic stop on July 10, and therefore that the evidence seized from his car should have been suppressed. When reviewing the denial of a suppression motion, this Court "consider[s] the facts in the light most favorable to the Commonwealth, the prevailing party at trial." *Aponte v. Commonwealth*, 68 Va. App. 146, 156 (2017) (quoting *Hairston v. Commonwealth*, 67 Va. App. 552, 560 (2017)). This Court reviews "the trial court's application of the law *de novo*" but "defer[s] to the trial court's 'findings of historical fact,' taking care to review them 'only for clear error and to give due weight to inferences drawn from those facts.'" *Bagley v. Commonwealth*, 73 Va. App. 1, 13 (2021) (quoting *Malbrough v. Commonwealth*, 275 Va. 163, 169 (2008)). When affirming the denial of a pretrial suppression motion, this Court considers the evidence admitted at the suppression hearing and at trial. *Commonwealth v. White*, 293 Va. 411, 414 (2017).

"The Commonwealth carries the burden of showing that a warrantless search and seizure was constitutionally permissible." *Jackson v. Commonwealth*, 267 Va. 666, 673 (2004). "However, a defendant must show, when viewing the evidence in the light most favorable to the Commonwealth, that the denial of the motion to suppress evidence was reversible error." *Id.*

"The Fourth Amendment protects individuals against unreasonable searches and seizures." *Jones v. Commonwealth*, 71 Va. App. 375, 380 (2019); *see* U.S. Const. amend. IV. "A traffic stop is a '"seizure" of the occupants of the vehicle and must be done in accordance with the Fourth Amendment.'" *Id.* (quoting *Heien v. North Carolina*, 574 U.S. 54, 60 (2014)). "To justify a traffic stop, an officer must have reasonable suspicion that the person stopped committed a crime or traffic violation." *Id.* "There are no bright line rules to follow when determining whether a reasonable and articulable suspicion exists to justify an investigatory stop." *Mitchell v. Commonwealth*, 73 Va. App. 243, 246 (2021) (quoting *Hoye v. Commonwealth*, 18 Va. App. 132, 134-35 (1994)). "Reasonable, articulable suspicion requires an officer to possess, at the time of the stop, 'a particularized and objective basis for suspecting the particular person stopped.'" *Id.* (quoting *Heien*, 574 U.S. at 60).

Officers must have "probable cause regarding criminal conduct" to escalate a traffic stop to an arrest. *See White v. Commonwealth*, 267 Va. 96, 104 (2004). Probable cause is "not a high bar." *Kaley v. United States*, 571 U.S. 320, 338 (2014). For a warrantless arrest of an individual suspected of committing a crime outside the officer's presence, the officer need only be aware of facts that "would warrant the belief of a prudent person that the arrestee had committed" such an offense. *United States v. Manbeck*, 744 F.2d 360, 376 (4th Cir. 1984).

Here, based on the facts presented both before and at trial, the police had probable cause to arrest Williams. Williams argues that the trial court's application of this standard was erroneous because "there was no apparent conduct by [Williams] that suggested the recent

occurrence of or ongoing criminal activity[.]" There was evidence, however, that Williams had been involved in criminal activity the previous evening. When Williams was arrested, police had placed one suspect at two incidents on the night of July 9th. Officers had reviewed surveillance footage that placed the Ford Expedition at the 5 Star and Old Ocean View Road. Furthermore, a witness identified a suspect as a man named "Tone" who lived in the area. Police located the Ford in the early hours of the morning on July 10th, watched Williams get into it, and drive away. Police also noted that Williams fit the description of the person on the surveillance footage. Police followed the car, called for a K-9 unit, and when they arrived, they stopped the car "on [the] probable cause that the person's been identified in the robbery, a shooting, and a homicide." Once stopped, Williams gave his name, and stated that he went by the nickname "Tone." At that point he was handcuffed and "placed . . . in the police vehicle." Williams now argues that this evidence merely created a "general description of the perpetrator" and that he personally could be placed only in the vicinity of the three crimes. We disagree. Taking together the car identification, the nickname, and the suspect description, this evidence provided sufficient probable cause to arrest Williams. Therefore, it was not error for the trial court to deny Williams's motion to suppress.

> II. The trial court did not abuse its discretion by allowing the video clips and the bullet casing into evidence.

"It is well-settled that '[d]ecisions regarding the admissibility of evidence "lie within the trial court's sound discretion and will not be disturbed on appeal absent an abuse of discretion."'" *Nottingham v. Commonwealth*, 73 Va. App. 221, 231 (2021) (alteration in original) (quoting *Blankenship v. Commonwealth*, 69 Va. App. 692, 697 (2019)). "Only when reasonable jurists could not differ can [this Court] say an abuse of discretion has occurred." *Id.* (quoting *Grattan v. Commonwealth*, 278 Va. 602, 620 (2009)). "[T]he abuse of discretion standard requires a reviewing court to show enough deference to a primary decisionmaker's

- 8 -

judgment that the [reviewing] court does not reverse merely because it would have come to a different result in the first instance." *Commonwealth v. Thomas*, 73 Va. App. 121, 127 (2021) (alterations in original) (quoting *Lawlor v. Commonwealth*, 285 Va. 187, 212 (2013)).

### A. The video clips

Williams argues that the trial court abused its discretion by allowing the Commonwealth to present video evidence that was provided to Williams after the close of discovery, a mere handful of days before trial. It is undisputed that the Commonwealth failed to provide two surveillance videos from La Batica, that were in its possession for two years, within the discovery timeline. The trial court nevertheless admitted limited portions of the videos, reasoning they would result in "no great prejudice" as they merely reflected witness testimony and added no other evidence.

Under Rule 3A:11(h) and Code § 19.2-265.4(B), a trial court has broad discretion to grant relief in response to a discovery violation in a criminal felony case. This power is, however, permissive. *See* Code § 19.2-265.4(B). Furthermore, "[w]hen a discovery violation does not prejudice the substantial rights of a defendant, a trial court does not err in admitting undisclosed evidence." *Davis v. Commonwealth*, 230 Va. 201, 204 (1985). In *Davis*, for example, the Commonwealth failed to disclose several autopsy photographs, but timely submitted higher quality autopsy photographs into evidence. *Id.* The Supreme Court held that when the defense "was unable to suggest to the trial court how their earlier disclosure would have benefited [the] defense or altered the course of the trial," sanctions were not warranted, and the new photographs were properly admitted into evidence. *Id.*

Williams similarly fails to argue (at trial and on appeal) how earlier disclosure of these video clips would have "benefited [his] defense or altered the course of the trial." *Id.* While Williams objected to the video's admission, he argued "[the Commonwealth] should not just be

allow[ed] . . . to get it in in its entirety" and that it should have been excluded because the Commonwealth's witnesses would testify as to the events on the video. Although Williams argues that the trial court "failed to provide a remedy" for the Commonwealth's late disclosure, the trial court did limit the video to clips to what Ramirez could corroborate. Furthermore, the clips as admitted raised no new facts. Consequently, we hold that the trial court did not abuse its discretion in admitting the clips.

## B. The shell casing

Williams next asserts that shell casing collected at Old Ocean View Road should not have been admitted as the Commonwealth failed to establish how the shell casing was deposited in a secure evidence locker. "[A] chain of custody is properly established when the Commonwealth's evidence affords reasonable assurance that the exhibits at trial are the same and in the same condition as they were when first obtained." *Anderson v. Commonwealth*, 274 Va. 469, 479 (2007) (alteration in original) (quoting *Vinson v. Commonwealth*, 258 Va. 459, 469 (1999)). "Whether the foundation is sufficient to properly establish the chain of custody is a question within the sound discretion of the trial court." *Id.* "When a 'vital link' in the possession and treatment of the evidence is left to conjecture, the chain of custody is incomplete, and the evidence is inadmissible." *Jeter v. Commonwealth*, 44 Va. App. 733, 737 (2005) (quoting *Robertson v. Commonwealth*, 12 Va. App. 854, 857 (1991)). "A court need not hear, however, from every witness who physically handled the samples for the certificate [of analysis] to be admissible. Nor must the Commonwealth's evidence 'exclude every conceivable possibility of substitution, alteration, or tampering.'" *Hargrove v. Commonwealth*, 53 Va. App. 545, 554 (2009) (alteration in original) (quoting *Anderson v. Commonwealth*, 48 Va. App. 704, 717 (2006)). Furthermore, unlike "vital links," "[g]aps in the chain [of custody] normally go to the weight of the evidence rather than its admissibility." *Aguilar v. Commonwealth*, 280 Va.

322, 332-33 (2010) (second alteration in original) (quoting *Melendez-Diaz v. Massachusetts*, 557 U.S. 305, 311 n.1 (2009)).

Williams argues that the Commonwealth is missing a vital link in the chain of custody for the shell casing recovered from the Old Ocean View Avenue crime scene. Although the shell casing was recovered from the crime scene by a detective and later retrieved from a secured evidence locker, at trial, two years after the incident, no one could tell how it had gotten into the evidence locker. Below, the court admitted the casing into evidence with no explanation as to its rationale.

We decline to disturb the trial court's admission of the shell casing. Williams introduced no evidence that the casing left police custody, nor did he allege that anything happened to the casing between its collection and retrieval from the evidence locker. "Where there is mere speculation that contamination or tampering could have occurred, it is not an abuse of discretion to admit the evidence and let what doubt there may be go to the weight to be given the evidence." *Reedy v. Commonwealth*, 9 Va. App. 386, 391 (1990). Furthermore, "[i]n the absence of clear evidence to the contrary, courts may presume that public officers have properly discharged their official duties." *Robertson*, 12 Va. App. at 856-57. Here, Williams merely speculates that something could have happened to the casing between collection and retrieval. Because the police enjoy the presumption to have discharged their official duties, the trial court did not abuse its discretion in allowing the casing into evidence.

III. The trial court did not err in joining the charges against Williams.

Williams next argues that the trial court erred in granting the Commonwealth's motion to join the charges. This Court reviews a trial court's decision to join offenses for abuse of discretion but interprets the Rules of the Supreme Court as questions of law which we review de novo. *Walker v. Commonwealth*, 289 Va. 410, 415 (2015). "Where a decision is reviewed for

an abuse of discretion, the appellate court does not substitute its own judgment 'for that of the trial court,' but considers 'only whether the record fairly supports the trial court's action.'" *Ragland v. Commonwealth*, 67 Va. App. 519, 535 (2017) (quoting *Grattan v. Commonwealth*, 278 Va. 602, 620 (2009)). When affirming a joinder ruling made before trial, this Court may consider both the proffers made at the pretrial hearing and the evidence presented at trial. *Grattan*, 278 Va. at 620-21.

Joinder of offenses is appropriate under Rule 3A:10(c) "if justice does not require separate trials, and (i) the offenses meet the requirements of Rule 3A:6(b) or (ii) the accused and the Commonwealth's attorney consent thereto." In this case, Williams did not consent to joinder of the offenses, and therefore the Commonwealth was required first to prove that justice did not require separate trials under Rule 3A:10(c). Second, it was required to prove "the offenses [were] based on the same act or transaction, or on two or more acts or transactions that are connected or constitute parts of a common plan or scheme" under Rule 3A:6(b).

### A. The crimes were connected.

The parties do not challenge whether the offenses were part of the same transaction, common plan, or scheme. Rather, the question before the Court then is whether the offenses were sufficiently "connected" for the purposes of Rule 3A:6(b). "To meet the 'connected' test, the crimes should be 'so intimately connected and blended with the main facts adduced in evidence, that they cannot be departed from with propriety.'" *Spence v. Commonwealth*, 12 Va. App. 1040, 1044 (1991) (quoting *Kirkpatrick v. Commonwealth*, 211 Va. 269, 272 (1970)). "A reviewing court must look to whether the transactions were 'closely connected in time, place, and means of commission, all of which support[] the use of a single trial.'" *Yellardy v. Commonwealth*, 38 Va. App. 19, 24 (2002) (quoting *Satcher v. Commonwealth*, 244 Va. 220, 229 (1992)).

The Commonwealth relies on *Brown v. Commonwealth*, 37 Va. App. 507 (2002), to argue the evidence at each crime scene "constituted critical corroboration" for "the other charges Williams was facing." In *Brown*, the defendant carjacked two individuals on the same day. *Brown*, 37 Va. App. at 515. There the court held the evidence from the two crimes was sufficiently "intertwined" to meet the "connected" test because the car stolen in the first crime was seen at the second, items stolen from the first victim were found in the car of the second victim, and the offenses occurred in quick succession. *Id.* The Commonwealth argues that the same is true here, reasoning "[t]he evidence from each robbery, the identification of the defendant, the car he was driving, [and] the gun he had, constituted critical corroboration for" the other charges against Williams. We agree.

As in *Brown,* the offenses in this case occurred in close temporal proximity between 7:00 p.m. and 11:30 p.m. on July 9. The physical evidence here was also "intertwined": the shell casings recovered at all three scenes matched the gun in Williams's constructive possession, the 1999 Ford Expedition was identified on surveillance footage from the 5 Star and Old Ocean View Road, and a gun and a green hoodie matching the robber's hoodie at La Batica were found in the 1999 Ford Expedition when Williams was arrested. To this end, the gun found in the Ford Expedition (as a result of surveillance footage from Old Ocean View Road) "corroborated" the shell casings at La Batica, and vice versa, as we discuss in the next section. Additionally, in *Brown* the Court found the testimony of each victim identifying Brown was "critical corroboration" of the other victim's testimony, which rebutted Brown's alibi. *Brown*, 37 Va. App. at 515. Here, too, the shell casings are corroborative of Williams's identity, and rebut Williams's argument that the Commonwealth failed to prove *he* shot the gun. For those reasons, the record "fairly supported" the trial court's finding that the crimes were connected for the purposes of Rule 3A:6(b), and the trial court did not abuse its discretion.

B.  Justice did not require separate trials.

Rule 3A:10(c) also required the Commonwealth to prove that justice did not require the offenses to be tried separately.  "Justice requires separate trials where the evidence of one of the crimes is not admissible in the trial of the other."  *Castillo v. Commonwealth*, 70 Va. App. 394, 414 (2019) (quoting *Godwin v. Commonwealth*, 6 Va. App. 118, 123 (1988)).  Evidence of a separate crime is "permissible in cases where the motive, intent or knowledge of the accused is involved, or where the evidence is connected with or leads up to the offense for which the accused is on trial."  *Brown*, 37 Va. App. at 516; *see also Yellardy*, 38 Va. App. at 25-26.

Here, the trial court did not abuse its discretion because evidence from both offenses would likely have been admissible to prove Williams's identity in the other had they been tried separately.  The gun found in the Ford Expedition matched the shell casings found at both La Batica and Old Ocean View Road.  The Ford Expedition was only identified because of surveillance footage from Old Ocean View Road and the 5 Star.  The fact that forensic testing showed that the shell casing found at La Batica was fired from the gun in Williams's possession supported the Commonwealth's theory that Williams fired shots there.  The same theory stands for the green hoodie found in the car when Williams was arrested, which matched the description of Williams's clothing when he robbed La Batica.  Thus, evidence tending to show Williams's identity in the joined trial would likely have been admissible had the two offenses been tried separately.

Because the charges were connected and justice did not require separate trials, it was not an abuse of discretion for the trial court to grant the Commonwealth's motion for joinder.

IV. The trial court did not err in denying the motion to strike.

Finally, Williams assigns error to the trial court's denial of his motion to strike for lack of sufficient evidence to convict. "We review the trial court's ruling denying the motion to strike in accordance with well-settled principles." *Avent v. Commonwealth*, 279 Va. 175, 198 (2010).

> When the sufficiency of [the Commonwealth's] evidence is challenged by a motion to strike, the trial court should resolve any reasonable doubt as to the sufficiency of the evidence in the [Commonwealth's] favor and should grant the motion only when it is conclusively apparent that [the Commonwealth] has proven no cause of action against defendant, or when it plainly appears that the trial court would be compelled to set aside any verdict found for the [Commonwealth] as being without evidence to support it.

*Id.* (alterations in original) (quoting *Banks v. Mario Indus.*, 274 Va. 438, 454-55 (2007)).

Williams makes three main arguments on the trial court's denial of his motions to strike. Williams first argues that "the circumstantial evidence at best established that [Williams] resembled the perpetrator that robbed [] La Batica." This argument is meritless as Williams himself acknowledged that he was in the still shots from La Batica's surveillance footage.

Second, Williams challenges the evidence supporting the reckless shooting charge stemming from the shooting that occurred outside La Batica. He claims Bautista "neither identified [Williams] nor did he observe a firearm being discharged" and "[n]o evidence established that the alleged robber was ever in the location where the casing was recovered." At trial, Bautista testified that the man robbing La Batica (whom he identified as wearing a green shirt and black pants) followed him outside the store and that Bautista turned to run before he heard gunshots. The shell casings found in the street outside La Batica matched the gun in Williams's constructive possession. A green hoodie was also found in Williams's car later that night, matching what the robber wore. It was not an abuse of discretion for the trial court to deny the motion to strike on this issue as Bautista's testimony brings this issue well within the "province of the jury."

- 15 -

Third, Williams argues that the evidence related to the homicide at Old Ocean View Drive merely created the "opportunity" for him to have shot Byas. Byas's widow, however, identified Williams at trial as the man whom she saw immediately before hearing the gunshot that killed Byas and testified that no one else was in the parking lot when the shot was fired. Williams concedes he was "in the immediate vicinity of where Mr. Byas was killed before the fatal shooting" but maintains there was no evidence "that he fired the fatal shot" even though "a shell casing was recovered in the parking lot that was fired from the handgun in [Williams's] constructive possession." Williams subsequently fled the parking lot. The weighing of evidence on this issue similarly lies within the province of the jury, and we therefore decline to disturb the trial court's denial of Williams's motions to strike.

## CONCLUSION

The trial court did not err in denying Williams's motion to suppress because he was legally arrested. It also did not abuse its discretion in admitting the Commonwealth's video evidence in a limited format, or a shell casing for which the Commonwealth established a sufficient chain of custody. It was further not error to join the charges when there were clear connections between the crimes. Finally, the trial court did not err in denying Williams's motions to strike, as there was sufficient evidence to be submitted to a factfinder. For these reasons, we affirm.

*Affirmed.*